[No. D043908. Fourth Dist., Div. One. June 28, 2005.]

RETA THOMPSON, Plaintiff and Respondent, v.
10,000 RV SALES, INC., Defendant and Appellant.

COUNSEL

Yunker & Schneider, David K. Schneider; and Holly Coates Keehn for Defendant and Appellant.

Paul, Hastings, Janofsky & Walker and Jason M. Frank for California RV Dealers Association as Amicus Curiae on behalf of Defendant and Appellant.

Manning, Leaver, Bruder & Berberich and Halbert B. Rasmussen for California Motor Car Dealers Association as Amicus Curiae on behalf of Defendant and Appellant.

Rosner, Law & Mansfield and Hallen D. Rosner for Plaintiff and Respondent.

OPINION

IRION, J.—Defendant 10,000 RV Sales, Inc. (10,000 RV), appeals a judgment in favor of plaintiff Reta Thompson on her complaint for violations of the Automobile Sales Finance Act (ASFA) (Civ. Code,[1] § 2981 et seq.), the Consumers Legal Remedies Act (CLRA) (§ 1750 et seq.), California's unfair competition law (UCL) (Bus. & Prof. Code, § 17200 et seq.) and other causes of action.[2] The action arose in connection with a contract between Thompson and 10,000 RV for the purchase and sale of a previously owned motor home. The court found 10,000 RV violated various consumer protection statutes and its acts and practices constituted fraud, entitling Thompson to rescission of the contract, restitution, punitive damages and a permanent injunction. On appeal, 10,000 RV challenges only the validity of the injunction, which prohibits it from "rolling over[-]allowances on trade-in vehicles into the cash price of the motor homes [it] sells and backdating sales contracts."[3] We affirm the judgment.[4]

---

[1] Statutory references are to the Civil Code unless otherwise specified.

[2] We granted the applications of California Motor Car Dealers Association and California RV Dealers Association to file separate amicus curiae briefs on behalf of 10,000 RV.

[3] 10,000 RV does not challenge that portion of the injunction prohibiting it from backdating sales contracts.

[4] We have considered various requests for judicial notice concurrently with this appeal and rule as follows: (1) the request of amicus curiae California RV Dealers Association (RV Dealers) to judicially notice the rulings and judgments in two Los Angeles Superior Court cases is denied; (2) RV Dealers' request to judicially notice exemplar pages of a 2001 edition of the Kelley Blue Book Official Guide for motor homes is denied; (3) RV Dealers' request to judicially notice an American Bar Association article published at 55 Business Law 1295 (2000) is granted; (4) RV Dealers' request to judicially notice the analysis of Senate Bill No. 1092 prepared for the 1999–2000 Regular Session by the Senate Committee on the Judiciary is granted; (5) Thompson's request to judicially notice a reporter's transcript and a ruling in two

## FACTUAL AND PROCEDURAL BACKGROUND

On May 11, 2001, Thompson signed a conditional sale contract in the form required by the ASFA (contract) to purchase a previously owned 1995 Safari motor home from 10,000 RV for a cash price of $93,398. 10,000 RV estimated the Safari could be sold for $85,000, but based on its customary discount of 18 to 20 percent, a cash customer could buy it for $69,398.

Thompson required financing to purchase the Safari and as part of the sales transaction, agreed to trade in her 2000 Shasta motor home, which was subject to a loan balance of $46,000. Although 10,000 RV appraised the Shasta at $30,000, it credited Thompson $54,000 on the trade-in, creating an "over-allowance" of $24,000. The over-allowance permitted Thompson to show on the face of the contract a net trade-in value of $8,000 ($54,000 minus $46,000) to apply toward the downpayment of the Safari. 10,000 RV admittedly created the over-allowance to enable Thompson to obtain lender approval for the purchase. The over-allowance would not have been created for a cash buyer, even one with a trade-in vehicle, because a cash buyer does not require a loan to complete the purchase and would not need to qualify to finance the purchase.

Thompson made a cash downpayment of $3,000. Several days after signing the original contract, Thompson made an additional downpayment of $10,000 at 10,000 RV's request.[5] The second contract, backdated to May 11, reflected a total downpayment of $21,000: the $8,000 net trade-in value of the Shasta plus the cash downpayment of $13,000.

10,000 RV did not disclose to Thompson that it had created a $24,000 over-allowance on her trade-in vehicle. Without Thompson's knowledge or consent, the $24,000 over-allowance was added to the $69,398 price of the Safari a cash purchaser would pay, to show a cash price of $93,398. The standard form contract signed by Thompson contains a section entitled "ITEMIZATION OF THE AMOUNT FINANCED," which requires inserting the cash price of the vehicle on line 1A and any prior credit or lease balance paid by the seller on line 1G.[6] In the contract for this transaction, 10,000 RV

---

unrelated superior court cases is denied; (6) Thompson's request to judicially notice documents relating to a Department of Motor Vehicles investigation is denied; and (7) Thompson's request to judicially notice an American Automobile Association magazine article is denied.

[5] After the lender rejected Thompson's application for credit, 10,000 RV told her the additional $10,000 was needed so she could qualify for financing.

[6] A copy of the standard form contract required by the ASFA to be used in credit vehicle sales is attached to this opinion to permit understanding of the references in the opinion to lines in the contract. (See appen., *post*, pp. 982–985.)

inserted $93,398 as the cash price on line 1A and "[not applicable]" on line 1G. (See appen., *post*, p. 982.)

After purchasing the Safari and traveling in it for several months, Thompson began having problems with the motor home. Thompson attempted to have repairs made under the extended warranty service contract she purchased from 10,000 RV, but the service contract did not contain the required coverage because it applied to a new, not previously owned, motor home. 10,000 RV refused to refund Thompson's money for the service contract or issue her another service contract covering her motor home.

Thompson sued 10,000 RV for damages, restitution and injunctive relief under the ASFA, CLRA and UCL.[7] She alleged: (1) the value of the Shasta trade-in was inflated to hide the negative equity associated with the transaction; (2) the negative equity was included in the cash price of the Safari; (3) there was no disclosure the negative equity was included in the cash price; and (4) it is 10,000 RV's standard practice not to disclose inclusion of negative equity in the cash price on line 1A of the contract. (See appen., *post*, p. 982.)

The parties waived jury. At trial, Matthew Leffingwell, 10,000 RV's sales manager who prepared and signed Thompson's contract, testified a $24,000 trade-in over-allowance was included in the cash price in Thompson's transaction. He explained a trade-in over-allowance is the difference between the trade-in vehicle's value stated in the contract and the dealer's valuation of the vehicle. Here, the Shasta's value in the contract was $54,000, but 10,000 RV valued the Shasta to be worth $30,000. This created a trade-in over-allowance of $24,000.

Leffingwell testified he valued Thompson's trade-in vehicle at $54,000 rather than $30,000 for purposes of obtaining credit approval for Thompson's purchase. Because Thompson owed $46,000 on the Shasta, there was negative equity of $16,000 ($46,000 minus $30,000). He explained lenders generally prefer a buyer not be in a negative equity position and require a certain downpayment to meet their loan-to-value percentage guidelines. Increasing the value of the trade-in vehicle to $54,000 resulted in showing Thompson had an $8,000 ($54,000 minus $46,000) positive trade-in value to submit to the lender. Leffingwell admitted negative equity is not included in the selling price for a cash buyer because the only reason for this practice, which 10,000 RV continues to use, is to obtain financing for a credit buyer. He testified there is no document for the consumer to sign that acknowledges

---

[7] Thompson also alleged violations of the Song-Beverly Consumer Warranty Act (§ 1790 et seq.) and the Magnuson-Moss Warranty Act (15 U.S.C. § 2301(3)). Neither of these causes of action is at issue in this appeal.

negative equity has been included in the cash price. Rather, he customarily shows the buyer 10,000 RV's value of the trade-in vehicle during negotiations and then explains that amount is marked up and the cash price is correspondingly increased.

10,000 RV's vice-president, Arthur Brady, testified it is standard practice for the dealership to include an over-allowance in the cash price of vehicles for credit buyers, but not for cash buyers. He explained the dealer's value of a trade-in vehicle is increased to eliminate negative equity and that increased amount is added to the cash price of the vehicle being purchased. Raising the value of the trade-in vehicle to equal or exceed the amount owed on it allows a credit buyer to show on a credit application a higher value for the trade-in vehicle and therefore less debt. Brady admitted no disclosure of this practice was made to Thompson.

Thompson testified that during the sales negotiations, there was no discussion that the trade-in value of her Shasta was $54,000. She was never told there was a $24,000 trade-in over-allowance or that the amount still owing on the trade-in vehicle was being included in the cash price.

Richard Ross, Thompson's financial expert and a former compliance officer for various federal credit laws and regulations, testified about the importance of properly disclosing the "cash price" in a vehicle credit sales transaction to comply with both state law and federal regulations. He explained any cost in a financed purchase that would not be incurred in a cash (i.e., noncredit) transaction is a finance charge that must be properly and fairly disclosed so the consumer can understand the true cost of credit. Further, accurate disclosure is required because the cash price of the vehicle affects sales tax and license and registration fees which are computed on the cash price.

Ross testified that in a transaction involving a trade-in vehicle, the dealer must determine whether an existing loan on the trade-in is greater than the value[8] of the vehicle. If so, there is a "negative trade" that creates the need to finance the prior loan balance and triggers certain disclosures. Although the contract must reflect the trade-in value, this value should be the value the dealer can immediately obtain from converting the trade-in vehicle to cash value because it determines the contribution of the trade-in vehicle to the transaction. A dealer can allocate a higher amount for the trade-in vehicle, as

---

[8] Ross defined this "value" as the price the dealer could get immediately if converting the trade-in vehicle to cash.

long as the dealer does not use that higher amount to increase the cash price of the vehicle being purchased. If an amount higher than the existing loan balance on the trade-in vehicle is added to the cash price of the vehicle being purchased, the dealer has included negative equity in the cash price. This practice violates the ASFA and its corresponding federal regulation, Regulation Z (12 C.F.R. § 226.1 (2005)) because the cash price inserted on line 1A of the contract is greater than the cash price of the vehicle for a customer paying cash. (See appen., *post*, p. 982.) Moreover, the disclosure provisions of the ASFA are violated because the buyer is unaware that he or she is financing part of the existing loan on the trade-in as well as a portion of the purchase price of the new vehicle.

Ross reviewed the transaction here as reflected in 10,000 RV's business records. Those records showed the value to 10,000 RV of Thompson's trade-in vehicle was $30,000. Because 10,000 RV agreed to a trade-in value of $54,000, a trade-in over-allowance of $24,000 was created, which was then improperly added to the $69,398 price of the vehicle were it purchased by a cash buyer, and was improperly disclosed as a cash price of $93,398 on line 1A of the contract. (See appen., *post*, p. 982.) Ross testified, without objection, that 10,000 RV's failure to specify a cash price of $69,398 violated the ASFA and Regulation Z. Ross confirmed with the Federal Reserve Board, the entity that issued and interprets Regulation Z, that this disclosure violated Regulation Z.

According to Ross, the contract also showed a violation in the required downpayment amount. By specifying a trade-in value of $54,000 when there was a loan balance of $46,000 on the trade-in vehicle, 10,000 RV created an $8,000 positive trade-in value. In reality, Thompson had a remaining loan balance of $16,000 because the actual cash value of the trade-in vehicle was only $30,000. Thus, the $8,000 allocated to the downpayment was a phantom or "straw" number. Because the value of the trade-in vehicle was a straw number, as admitted by 10,000 RV's representatives in their depositions, Ross concluded 10,000 RV did not make a fair and accurate disclosure in the contract.

Ross noted Thompson made a $13,000 cash downpayment, which, under the ASFA, must first be applied to the $16,000 outstanding loan balance,[9] leaving $3,000 to be paid on Thompson's loan on the trade-in vehicle. Where, as here, there is a negative number (i.e., a remaining amount to be paid on an existing loan), it must be disclosed under the itemization of

---

[9] The $16,000 loan balance is the difference between the value of the trade-in vehicle and the outstanding loan balance on the trade-in vehicle: $46,000 minus $30,000.

amount financed on line 1G (prior credit balance) of the contract. (See appen., *post*, p. 982.) Ross explained that in effect, this amount is a loan that is being consolidated with the new purchase loan to pay off the balance owing on the trade-in vehicle. Nothing in the contract showed the $13,000 downpayment was used to pay the loan balance on the trade-in vehicle.

Ross pointed out that contracts with undisclosed negative equity also create problems from the lender's perspective. The lender sets its risk policies (e.g., how to set rates and reserve losses, and how to determine the value of collateral and potential loss in the event of default) based on loan-to-value ratios that necessarily include the "real" selling price of the vehicle. If the inflated value of a trade-in vehicle is added to the cash price, the over-allowance affects the lender's risk position because it is then loaning against a fictitious selling price. Lenders are not in the business of advancing excess amounts over the actual purchase price of a vehicle.

According to Ross's calculations, the $24,000 over-allowance on Thompson's Shasta, which was included in the cash price of the Safari, increased the sales tax Thompson paid on the Safari by $1,800. Because this amount was financed over 20 years at an annual rate of 9.25 percent, Thompson would pay an additional $2,157.60 in interest during the term of the contract. Similarly, the vehicle license fee paid by Thompson was increased in proportion to the amount of the over-allowance on the trade-in vehicle.

The court heard the testimony of several other customers of 10,000 RV on the issue of trade-in over-allowances. Lucille Cline and Sherry Adams testified to sales transactions similar to Thompson's contract. 10,000 RV misled Cline and Adams as to the value of their trade-in vehicles and the inclusion of over-allowances in the cash price of the vehicles they were purchasing. They were not told about the cash price increases or the effect the increased price had on their interest payments and vehicle license fees. Neither Cline nor Adams would have completed the transactions had they known the true facts.

10,000 RV customers Rick Mathis and Wayne Pecjak testified they each negotiated a sales transaction in which they knew the cash value of the vehicles they were purchasing. However, after the terms were agreed upon, 10,000 RV told them the numbers needed to be changed for financing purposes. Specifically, Mathis and Pecjak were told their trade-in vehicles must be over-valued and the resulting over-allowances added to the cash price to obtain financing. 10,000 RV did not disclose that the sales tax and license fees would also be increased by these new values.

The court issued a statement of decision, finding Thompson met her burden of proof to establish violations of the ASFA, CLRA and UCL. Specifically, the court found 10,000 RV violated the ASFA by inflating the cash price of the Safari motor home to include the trade-in over-allowance on the Shasta, failing to disclose the loan balance on the trade-in vehicle on line 1G of the contract and backdating the second contract. (See appen., *post*, p. 982.) The court concluded Thompson was entitled to restitution and rescission of the contract.

The court further found 10,000 RV had a pattern and practice of including trade-in over-allowances in the cash prices of the vehicles it sells, without full and complete disclosure to its customers, in violation of the ASFA and CLRA. By engaging in this pattern and practice, the court found, 10,000 RV committed intentional fraud and acted in conscious disregard of the rights of Thompson and other consumers, justifying an award of punitive damages. The court also awarded a senior citizen[10] penalty under section 1780, subdivision (b), and issued an injunction prohibiting 10,000 RV from including trade-in over-allowances in the cash price of the vehicles it sells.

The court found 10,000 RV's acts and practices of including trade-in over-allowances in the cash price of its vehicles are fraudulent and unfair in violation of the UCL. Violations of the ASFA and CRLA are per se violations of the UCL. Further, 10,000 RV's acts are likely to deceive the public and thus are fraudulent within the meaning of the UCL. Because the unlawful, unfair and fraudulent acts of 10,000 RV are continuing, the court issued an injunction prohibiting 10,000 RV from including over-allowances on trade-in vehicles in the cash price of vehicles it sells.[11] The court entered judgment in accordance with its statement of decision.

## DISCUSSION

10,000 RV contends the court erred by issuing a permanent injunction prohibiting it from including over-allowances on trade-in vehicles in the cash price of vehicles it sells. 10,000 RV asserts the injunction prohibits legal conduct under the ASFA and Regulation Z, and is too vague to be enforced.[12]

[10] At the time of trial, Thompson was 73 years old.

[11] Although not relevant to this appeal, the court also ordered restitution to those customers of 10,000 RV whose files were produced during discovery showing inclusion of an over-allowance on a trade-in vehicle. The amount of restitution consisted of the increased amount of sales tax and license fees these customers were charged as a result of the over-allowance on their trade-in vehicles that was included in the cash price.

[12] Preliminarily, Thompson questions whether the injunction has been properly appealed because 10,000 RV has limited its arguments to violations of the ASFA and does not discuss violations of CLRA and UCL for which the injunction was issued. However, as expressly

## I

### Standard of Review

■ "A permanent injunction is a determination on the merits that a plaintiff has prevailed on a cause of action . . . against a defendant and that equitable relief is appropriate." (*Art Movers, Inc. v. Ni West, Inc.* (1992) 3 Cal.App.4th 640, 646 [4 Cal.Rptr.2d 689].) "The trial court's decision to grant a permanent injunction rests within its sound discretion and will not be disturbed on appeal absent a showing of a clear abuse of discretion." (*Shapiro v. San Diego City Council* (2002) 96 Cal.App.4th 904, 912 [117 Cal.Rptr.2d 631]; see *San Diego Union v. City Council* (1983) 146 Cal.App.3d 947, 952 [196 Cal.Rptr. 45].) Notwithstanding its discretionary component, a permanent injunction must be supported by substantial evidence in the record. (*Art Movers, Inc. v. Ni West, Inc., supra,* at p. 646.)

"[T]o the extent the trial court had to review the evidence to resolve disputed factual issues, and draw inferences from the presented facts, [we] review such factual findings under a substantial evidence standard." (*Shapiro v. San Diego City Council, supra,* 96 Cal.App.4th at p. 912.) In this regard, we resolve all factual conflicts and questions of credibility in favor of the prevailing party and indulge all reasonable inferences to support the trial court's order. (*Cabrini Villas Homeowners Assn. v. Haghverdian* (2003) 111 Cal.App.4th 683, 688–689 [4 Cal.Rptr.3d 192].) Nevertheless, when reviewing the interpretation and application of a statute where the ultimate facts are undisputed, we exercise our independent judgment to determine whether the injunction was proper. (*San Diego Union v. City Council, supra,* 146 Cal.App.3d at p. 952; *Dawson v. East Side Union High School Dist.* (1994) 28 Cal.App.4th 998, 1041 [34 Cal.Rptr.2d 108].)

Here, the trial court necessarily resolved disputed factual issues[13] to find Thompson met her burden of proving 10,000 RV violated the ASFA by increasing the cash price of the vehicles it sells to include trade-in over-allowances and by failing to disclose a prior credit balance on line 1G in the contract as to trade-in vehicles. (See appen., *post*, p. 982.) The court further found the evidence supported Thompson's claims 10,000 RV violated the CLRA and UCL by its pattern and practice of including trade-in over-allowances in the cash price of the vehicles it sells without full and complete disclosure to its customers, justifying the issuance of a permanent injunction.

---

found by the court in its statement of decision, 10,000 RV's CLRA and UCL violations were predicated on violations of the ASFA. Thus, 10,000 RV has properly challenged the injunction in this appeal.

[13] The case proceeded to trial after the court denied Thompson's motion for summary adjudication on her cause of action under the ASFA.

In determining whether the injunction was proper, we review the court's factual findings under a substantial evidence standard but exercise our independent judgment as to the interpretation of the ASFA, CLRA and UCL and their application to the ultimate facts found. (*Shapiro v. San Diego City Council, supra,* 96 Cal.App.4th at p. 912.)

II

*Background of Consumer Credit Laws*

Congress enacted the Truth in Lending Act (15 U.S.C. § 1601 et seq. (TILA)) in recognition that uniform credit disclosures would enhance "the competition among the various financial institutions and other firms engaged in the extension of consumer credit," and "assure a meaningful disclosure of credit terms so that the consumer will be able to compare more readily the various credit terms available to him and avoid the uninformed use of credit." (15 U.S.C. § 1601(a).) In this regard, TILA protects consumers from inaccurate and unfair credit practices. (*Ibid.; Yazzie v. Ray Vicker's Special Cars, Inc.* (D.N.M. 1998) 12 F.Supp.2d 1230, 1232.)

Under the authority granted in TILA, the Federal Reserve Board issued governing regulations, commonly referred to as Regulation Z. (12 C.F.R. § 226.1 et seq. (2005); see *Ford Motor Credit Co. v. Milhollin* (1980) 444 U.S. 555, 559–560 [63 L.Ed.2d 22, 100 S.Ct. 790]; *Mourning v. Family Publications Service, Inc.* (1973) 411 U.S. 356, 366 [36 L.Ed.2d 318, 93 S.Ct. 1652].) Regulation Z and related official staff interpretations "generally implement TILA as a whole" (*Bescos v. Bank of America* (2003) 105 Cal.App.4th 378, 386 [129 Cal.Rptr.2d 423]) and are meant "to promote the informed use of consumer credit by requiring disclosures about its terms and cost." (12 C.F.R. § 226.1(b).) Disclosures must ensure credit customers are charged no more than cash customers in comparable transactions. (12 C.F.R. § 226.4(a).) To address the problem of buried finance charges, Regulation Z extends TILA's coverage to all credit transactions " 'for which either a finance charge is or may be imposed.' " (*Glaire v. LaLanne-Paris Health Spa, Inc.* (1974) 12 Cal.3d 915, 920 [117 Cal.Rptr. 541, 528 P.2d 357], citing former 12 C.F.R. § 226.2(k).) TILA's purposes have led the courts to strictly enforce its requirements as well as those of Regulation Z. (*Yazzie v. Ray Vicker's Special Cars, Inc., supra,* 12 F.Supp.2d at p. 1232.)

■ The California Legislature enacted the ASFA to protect motor vehicle purchasers from abusive selling practices and excessive charges by requiring full disclosure of all items of cost. (*Hernandez v. Atlantic Finance Co.* (1980) 105 Cal.App.3d 65, 69 [164 Cal.Rptr. 279].) Under the ASFA, every conditional sale contract must disclose to the buyer all details concerning the sale, financing and complete costs of purchasing the vehicle. (§ 2982; *Hernandez v. Atlantic Finance Co., supra,* at p. 70.) All contracts subject to the ASFA's provisions must contain the disclosures required by Regulation Z. (§ 2982.) The ASFA's requirements are mandatory. (*Hernandez v. Atlantic Finance Co., supra,* at p. 69.) Moreover, in determining whether consumer protection laws such as the ASFA apply to a particular transaction, we look to the substance of the transaction and do not allow mere form to dictate the result. (*King v. Central Bank* (1977) 18 Cal.3d 840, 847 [135 Cal.Rptr. 771, 558 P.2d 857].)

III

*Disclosure of Cash Price, Downpayment and Amount Financed*

A

*Cash price*

■ The ASFA requires inclusion of the cash price of a vehicle and the amount financed in a conditional sale contract. (§ 2982.) Under section 2982, subdivision (a), the contract must contain an " 'itemization of the amount financed.' " This includes: "(1)(A) The cash price, *exclusive* of document preparation fees, taxes imposed on the sale, pollution control certification fees, *prior credit* or lease *balance on property being traded in,* and the amount charged for a service contract." (Italics added.) The cash price to be included on line 1A of the contract necessarily *excludes* the amount owed on a trade-in vehicle. (§ 2982, subd. (a)(1)(A); see appen., *post,* p. 982.) Instead, that amount must be included in the calculation for information inserted on line 1G under " 'prior credit or lease balance (see downpayment and trade-in calculation).' " (§ 2982, subd. (a)(1)(G); see appen., *post,* p. 982.)

Regulation Z defines cash price as "the price at which a creditor, in the ordinary course of business, offers to sell for cash the property or service that is the subject of the transaction. . . . The term does not include any finance charge." (12 C.F.R. § 226.2(a)(9) (2005).) Similarly, the ASFA defines cash price as "the amount for which the seller would sell and transfer to the buyer unqualified title to the motor vehicle described in the conditional sale contract." (§ 2981, subd. (e).) The Federal Reserve Board's official staff interpretation to Regulation Z explains that the definition of cash price includes "[a]ny charges imposed equally in cash and credit transactions." (12 C.F.R. § 226.2(a)(9) (Supp. I).) Thus, the cash price required to be itemized in accordance with section 2982, subdivision (a)(1)(A) must be the same for both a credit and cash customer. To the extent the cash price for a financed purchase is inflated above the selling price in a comparable cash transaction, the difference is a finance charge. (Official staff interpretation, 12 C.F.R. § 226.4(a) (Supp. I).)

TILA requires creditors to separately disclose finance charges to consumers. (15 U.S.C. § 1638(a)(3).) Regulation Z defines "finance charge" as any charge imposed directly or indirectly as a condition or incident of credit. (12 C.F.R. § 226.4(a) (2005).) Under the ASFA, "finance charge" has the same meaning set forth for that term under Regulation Z. (§ 2981, subd. (i).) In determining whether there is a finance charge in a credit transaction, a creditor evaluates comparable charges in a cash transaction. (Official staff interpretation, 12 C.F.R. § 226.4(a) (Supp. I).) Thus, when a creditor charges credit customers a higher price for an item than it charges cash customers, the extra amount is a finance charge and must be disclosed as a finance charge. (*Ibid.*; *Gibson v. Bob Watson Chevrolet-Geo, Inc.* (7th Cir. 1997) 112 F.3d 283, 287 [automobile purchasers stated claim against dealers under TILA for failing to disclose finance charge on extended warranty contracts]; see also *Walker v. Wallace Auto Sales, Inc.* (7th Cir. 1998) 155 F.3d 927, 930 [defendant artificially inflated cost of vehicle to cover discount at which finance company purchased contract, and thus imposed hidden finance charge on plaintiff].)

The cash price set forth in the contract in accordance with section 2982, subdivision (a)(1)(A) is increased by adding other specified costs to determine the "total cash price." (§ 2982, subd. (a)(1)(I).) The total cash price as stated in the contract includes the loan balance remaining on property being traded in to be paid by the seller, which has been separately itemized and disclosed in accordance with section 2982, subdivision (a)(1)(G), and which is *not* part of the cash price required by section 2982, subdivision (a)(1)(A).

## B

### *Downpayment*

Section 2982, subdivision (a)(6) requires the amount of the buyer's downpayment be itemized as follows:

"(A) The agreed value of the property being traded in.

"(B) The prior credit or lease balance, if any, owing on the property being traded in.

"(C) The net agreed value of the property being traded in, which is the difference between the amounts disclosed in subparagraphs (A) and (B). If the prior credit or lease balance of the property being traded in exceeds the agreed value of the property, a negative number shall be stated. [¶] . . . [¶]

"(F) The remaining amount paid or to be paid by the buyer as a downpayment.

"(G) The total downpayment. If the sum of subparagraphs (C) to (F), inclusive, is zero or more, that sum shall be stated as the total downpayment and no amount shall be stated as the prior credit or lease balance under subparagraph (G) of paragraph (1). If the sum of subparagraphs (C) to (F), inclusive, is less than zero, then that sum, expressed as a positive number, shall be stated as the prior credit or lease balance under subparagraph (G) of paragraph (1), and zero shall be stated as the total downpayment. . . ."

## C

### *Amount Financed*

■ Under section 2982, subdivision (a)(8), the " 'amount financed' " must be separately disclosed and labeled by first calculating a subtotal for the "total cash price" (§ 2982, subd. (a)(1)(A)–(H)), plus license, registration and various other fees (§ 2982, subd. (a)(2)(A)–(C), (3), (4)) and then subtracting the sum of the amount of the buyer's downpayment (§ 2982, subd. (a)(6)) and any administrative finance charge (§ 2982, subd. (a)(7)). Requiring disclosure in this way permits the amount financed to be clearly identified and segregated from other charges to enable the consumer to understand the cost of financing and thereby make an informed use of credit. (15 U.S.C. § 1601 (a).)

## D

### *1999 Amendments to the ASFA*

The current version of section 2982 was the result of various revisions to the ASFA by Senate Bill No. 1092 in 1999 to clarify the "total cash price," "downpayment" and "itemization of the amount financed" disclosure requirements in a conditional sale contract for a motor vehicle when a trade-in vehicle is involved in the sale. The amendments were made to conform with federal law, specifically Regulation Z pertaining to the disclosure of "negative equity financing," which ". . . describes the circumstances when, in addition to financing the purchase of a new product, a creditor agrees to finance the remaining credit or lease balance owing on the property being traded in.

"Apparently, it was a common practice for automobile dealers to disclose a negative number on the 'downpayment' line in circumstances involving a negative equity trade in, and then to increase the 'total amount financed' of the newly financed vehicle by a like sum. However, . . . this practice confused consumers, who, when looking over the itemization sheet, believed that a negative number on the downpayment line should reduce the total amount financed rather than increase it.

"Under the revised staff commentary to Regulation Z, a zero, not a negative number, is now required to appear on the 'downpayment' line, unless there is also a cash payment involved. In addition, any prior credit or lease balance remaining on property being traded-in is now required to be separately listed as a positive figure in the 'itemization of amount financed.' " (Assem. Com. on Judiciary, Analysis of Sen. Bill No. 1092 (1999–2000 Reg. Sess.) as amended June 22, 1999, p. 3.)

Thus, section 2982, subdivision (a)(6)(G) requires the negative equity in a trade-in vehicle to be disclosed as a positive number identified as "prior credit or lease balance" (§ 2982, subd. (a)(1)(G)), and the total downpayment to be stated as zero.

## IV

### *The ASFA Was Violated Because the Cash Price in Thompson's Contract Was Greater Than the Cash Price for a Cash Customer*

10,000 RV contends that adding "the cost imposed by money owed on a trade-in [vehicle] to the sales price of a replacement [vehicle]" is a legal act under the ASFA and is standard industry practice. 10,000 RV asserts there

was no violation of the ASFA because the cash price would have been the same for both a credit and cash customer with the same trade-in vehicle and the price Thompson paid for the Safari was not increased as a result of her credit purchase.

■ The amount paid by a credit buyer that is not paid by a cash buyer is the finance charge. (12 C.F.R. § 226.4 (2005).) To the extent the cash price in a credit transaction is increased above the cash price in a comparable cash transaction, the difference is a finance charge which must be disclosed. (Official staff interpretation, 12 C.F.R. § 226.4(a) (Supp. I); *Gibson v. Bob Watson Chevrolet-Geo, Inc., supra,* 112 F.3d at p. 287; *Walker v. Wallace Auto Sales, Inc., supra,* 155 F.3d at p. 930.)

Here, the undisputed evidence showed the cash price of the Safari was determined based on Thompson's financing needs. 10,000 RV admittedly overvalued Thompson's trade-in vehicle by $24,000 and then added $24,000 to the cash price of the Safari as set forth on line 1A1 of the contract. (See appen., *post,* p. 982.) The over-allowance was created expressly for the purpose of allowing Thompson to show a lender a positive equity in the trade-in vehicle. 10,000 RV admitted it would not have increased the cash price by the amount of the trade-in over-allowance for a cash buyer who did not require financing and did not need credit approval. The over-allowance was added to the cash price only because there was a credit transaction and thus was required to be disclosed as a finance charge. (See *Yazzie v. Ray Vicker's Special Cars, Inc., supra,* 12 F.Supp.2d at pp. 1232–1233 [finance charge is imposed if the seller refuses to extend credit until the consumer agrees to pay the charge; details of the manner in which the charge is imposed are irrelevant]; *Berryhill v. Rich Plan of Pensacola* (5th Cir. 1978) 578 F.2d 1092, 1099 [charge imposed for service agreement was condition incident to extension of credit and therefore a finance charge].) Because inclusion of the over-allowance in the cash price of the Safari was a condition of credit and therefore a finance charge, failing to disclose the over-allowance as a finance charge violated the disclosure provisions of the ASFA and Regulation Z.

Further, when 10,000 RV increased the cash price of the Safari by $24,000 more than the cash price a cash buyer would have paid, the higher cash price caused Thompson to pay more in sales tax and license fees, which were calculated on the increased cash price. The increase in sales tax and fees, imposed as a condition of financing for Thompson, was also a finance charge and was required to be so disclosed. (15 U.S.C. § 1601 et seq.; 12 C.R.F. § 226.1 (2005).)

10,000 RV's practice of manipulating numbers in this manner would not occur in a cash transaction, even with a comparable trade-in, because there

would be no need to increase the cash price of the vehicle without the need for financing. At trial, Ross testified he confirmed with the Federal Reserve Board's legal department that adding an over-allowance on a trade-in vehicle to the cash price of a vehicle being purchased is a disclosure violation under Regulation Z. Despite 10,000 RV's claim this is standard industry practice, failing to disclose the true nature of these finance charges violates the ASFA.

V

*The ASFA Prohibits Increasing the Cash Price to Include an
Over-allowance on a Trade-in Vehicle in a Credit
Transaction*

10,000 RV contends that even in credit transactions, the ASFA does not prohibit increasing the cash price of a vehicle to include the value of a trade-in vehicle. Rather, it argues, the ASFA *requires* a dealer to include the increased value in the cash price of the vehicle being purchased, as was done here, because the definition of "cash price" in section 2981, subdivision (e) *includes* "payment of a prior credit . . . balance remaining on property being traded in." Thus, 10,000 RV asserts, it properly included the trade-in value of the Shasta in the cash price of the Safari on line 1A1 of the contract. (See appen., *post*, p. 982.)

■ 10,000 RV's reliance on section 2981, subdivision (e) to support its argument is misplaced. Section 2981 sets forth the definitions used in the ASFA, *"unless the context otherwise requires."* (Italics added.) Under section 2981, subdivision (e), " '[c]ash price' means the amount for which the seller would sell and transfer to the buyer unqualified title to the motor vehicle described in the conditional sale contract, *if the property were sold for cash* at the seller's place of business on the date the contract is executed, and shall include taxes to the extent imposed on the cash sale and the cash price of accessories or services related to the sale such as delivery, installation, alterations, modifications, improvements, document preparation fees, a service contract, and payment of a prior credit or lease balance remaining on property being traded in." (Italics added.) By its inclusionary language, section 2981, subdivision (e) defines the total cash price of a vehicle. However, section 2982 controls the formalities of what a conditional sale contract must contain and how its disclosures are to be made in a purchase that is being financed. In the context of disclosing the " 'itemization of the amount financed,' " section 2982, subdivision (a)(1)(A) expressly *excludes* from "cash price" the prior credit balance on the trade-in vehicle. Instead, the prior credit balance must be separately itemized in accordance with section 2982, subdivision (a)(1)(G) to accurately disclose the amount being financed. This interpretation is consistent with Regulation Z, which excludes from its

definition of "cash price" any finance charge. (12 C.F.R. § 226.2(a)(9) (2005).) The definition of "cash price" in section 2981, subdivision (e), which includes all costs associated with the purchase of the vehicle, more aptly applies to the "total cash price" as required to be disclosed under section 2982, subdivision (a)(1)(I) after those costs have been separately itemized for purposes of disclosing any finance charges.[14]

■ In its statement of decision, the trial court judicially noticed the definition of "cash price" under the ASFA by the California Department of Consumer Affairs. The state's official policy relating to negative equity reflects that adding either disclosed or undisclosed negative equity to the cash price of the vehicle is illegal under the ASFA, CLRA and UCL because the cash price cannot be influenced by a trade-in value. Here, the uncontroverted evidence showed 10,000 RV determined the cash price of the Safari by overvaluing Thompson's trade-in vehicle by $24,000 and then increasing the cash price of the Safari by $24,000. In so doing, 10,000 RV did not properly disclose the cash price as required by section 2982, subdivision (a)(1)(A). By overvaluing the Shasta, 10,000 RV did not disclose its accurate net trade-in value. (§ 2982, subd. (a)(6)(C).) This, in turn, made the disclosure of the itemization of the amount financed inaccurate, in violation of the ASFA and Regulation Z.

## VI

### The Cost of Credit Was Not Properly Disclosed

10,000 RV contends the ASFA regulates the credit financing of motor vehicles and not their sale, and thus the ASFA's only disclosure requirement is the cost of credit, not the value of the vehicle. 10,000 RV asserts it negotiated with Thompson the cash price of the Safari and the trade-in allowance for the Shasta, and then accurately disclosed the amount financed on the contract Thompson signed.

■ We agree with 10,000 RV's position there is nothing unlawful in negotiating sales prices of vehicles and trade-in values. (See *Stasher v.*

---

[14] If a dealer includes the amount it overpaid on a trade-in vehicle when determining the cash price of the vehicle being purchased, the dealer is, theoretically, including the trade-in vehicle's prior credit in the cash price of the new vehicle. But section 2982, subdivision (a)(1)(A) requires the cash price of the vehicle being purchased to be separately stated, exclusive of the prior credit balance on the trade-in vehicle. That prior credit balance must be specifically identified in the subparagraphs below the cash price on line 1A1 of the conditional sale contract and totaled to determine total cash price. (§ 2982, subd. (a)(1)(I); see appen., *post*, p. 982.) Although the prior credit balance is ultimately part of the total cash price, the ASFA requires the dealer to first subtract the trade-in vehicle's prior credit balance from the cash price listed on line 1A1 of the conditional sale contract and then separately state that amount as the prior credit balance on line 1G. (See appen., *post*, p. 982.)

*Harger-Haldeman* (1962) 58 Cal.2d 23, 30–32 [22 Cal.Rptr. 657, 372 P.2d 649] [discussing predecessor statute to the ASFA].) However, the evidence here showed that although the cash price, the value of the trade-in vehicle and the amount financed were *stated* in the contract signed by Thompson, 10,000 RV did not disclose that the $24,000 trade-in over-allowance or the amount still owing on Thompson's trade-in vehicle were included in the cash price of the vehicle she purchased. The contract showed Thompson had no prior credit balance on her trade-in vehicle when, in reality, she had a remaining loan balance of $16,000 in addition to the $30,000 value 10,000 RV believed the trade-in was worth. The numbers were then manipulated to show the Shasta had an $8,000 positive trade-in value so Thompson could get financing approved.[15] Consequently, cost items that comprised the amount financed were inaccurate and violated the ASFA's disclosure provisions and Regulation Z.

## VII

### *The Injunction Does Not Attempt to Regulate the Sales Price of Vehicles*

10,000 RV contends the court erred by adopting the particular concept of "value" for previously owned vehicles that have no manufacturer's suggested retail price. 10,000 RV asserts the court's concept of value has no application under the ASFA or Regulation Z, and cannot serve as a valid component in calculating an "over-allowance" enjoined from being added to the cash price of a vehicle.

### A

### *Cash Price of the Safari*

10,000 RV asserts that to determine the cash price for the Safari purchased by Thompson, it was not legally bound by an internal bookkeeping document showing the approximate price for which it hoped to sell the vehicle ($85,000), reduced to a figure never disclosed or known to Thompson ($69,398) at the time of sale.

The evidence showed the original asking price for the Safari was $85,000, and based on 10,000 RV's customary price reduction policy, a cash customer

---

[15] In their depositions, Leffingwell and Brady testified the cash price was based on determining how Thompson's negative equity and shortfall in downpayment could be accommodated and absorbed into the pricing of the Safari she was purchasing. Brady further testified it is standard practice to include negative equity in the cash price of a vehicle and not to disclose it as a prior credit balance remaining on property being traded in. This is precisely the practice the Legislature sought to prohibit by its 1999 amendments to the ASFA.

could buy it for about $69,000. Leffingwell and Brady admitted the cash price was based on determining how Thompson's negative equity and shortfall in downpayment could be accommodated and absorbed into the pricing of the Safari. Thompson was never told this was the manner in which the cash price was determined. Thus, the $93,398 cash price for the Safari in the contract included amounts a cash buyer would not have paid and therefore should not have been included in the cash price.

 Although a dealer has no obligation to sell a vehicle at the price listed on its inventory sheet or other internal document and may discount or increase that price based on a variety of factors, the dealer cannot in a credit sale determine the cash price of a vehicle by creating an over-allowance on a trade-in vehicle and then adding that amount to the cash price. When a dealer does so, consumers are defrauded because there is no disclosure the new purchase includes financing the unpaid credit balance on the trade-in vehicle and no disclosure they are paying sales tax and license fees on these increased amounts. Rather, the dealer must offer the vehicle at a price that reflects an amount imposed equally in cash and credit transactions, so any additional charge is explicitly identified and disclosed as a finance charge.[16] (12 C.F.R. § 226.2(a)(9) (2005).) 10,000 RV violated the ASFA and Regulation Z when it did not identify and disclose the items comprising the finance charge imposed on Thompson's purchase.

B

*Value of the Shasta*

10,000 RV asserts the court erred by finding the Shasta had a particular value setting its trade-in allowance. Because a trade-in vehicle has no set value, it argues, the $54,000 negotiated allowance was the agreed value and was properly disclosed as the trade-in value of the Shasta. 10,000 RV further claims the $30,000 value reflected in its internal documents was the vehicle's "fire sale" value and has no application under the ASFA or Regulation Z, and no relevance to this case.

The concept of trade-in value and its relevance to Thompson's purchase transaction were explained at trial. Leffingwell testified he typically uses the "fire sale" value of a trade-in vehicle as a negotiating tool and explains to the customer how he marks up that value and then increases the cash price of

---

[16] 10,000 RV's concern *it will need to arbitrarily set a standard trade-in value for every used* vehicle is unfounded. If the trade-in amount is negotiated in good faith to reflect the true value to the dealer, and not simply to create a phantom number to make the buyer creditworthy, the trade-in value will be properly disclosed in the contract.

the vehicle being purchased by a corresponding amount. Leffingwell admitted he valued Thompson's trade-in vehicle as $54,000 rather than the $30,000 fire sale value[17] for the sole purpose of extending credit to her. In so doing, Leffingwell was able to show on Thompson's contract an $8,000 positive trade-in value for the Shasta to submit to the lender. Thompson testified this was never explained or disclosed to her.

Thompson's expert Ross testified 10,000 RV's practice of valuing a trade-in vehicle higher than its fire sale value and then adding the overvalued amount to the cash price of another vehicle violates the ASFA and Regulation Z. He explained the value of a trade-in vehicle is significant in determining compliance with the ASFA's disclosure requirements. Although the ASFA does not require the fire sale value of the trade-in vehicle be disclosed in the contract, that value must be used in the sales transaction to accurately determine the "contribution" of the trade-in to the dealer. A dealer can agree to allocate a greater value to a trade-in vehicle but the dealer must itemize that increased value in a manner other than increasing the cash price of the vehicle being purchased.

When 10,000 RV disclosed a trade-in value of $54,000 for the Shasta, it created a "straw" number that was included in the downpayment, thereby concealing Thompson's negative equity position in the trade-in vehicle. As a result, the cash price of the Safari in the contract contained hidden or buried costs passed on to Thompson[18] through an undisclosed additional amount financed.

Under section 2982, subdivision (a)(6)(A), the amount of the buyer's downpayment must be itemized to show the "agreed value of the property being traded in." Although the statute does not specifically define "agreed value," the ASFA's overriding policy of full and fair disclosure presupposes the dealer has honestly disclosed the true value of a trade-in vehicle as a starting point in the parties' good faith negotiations. The parties may ultimately agree to any value after the dealer has met its obligation to honestly

---

[17] We recognize the value of a trade-in vehicle, as stated in an internal dealer document, is the value given to a trade-in vehicle for liquidation purposes, that is, if the dealer "wanted to liquidate [the vehicle] immediately for cash." We also agree with 10,000 RV that a dealer is not legally bound by a trade-in vehicle's value when negotiating a trade-in as part of a vehicle sale. Here, however, 10,000 RV presented no evidence the value of Thompson's trade-in vehicle was anything other than $30,000 and further admitted it valued the trade-in vehicle at $54,000 solely to obtain financing for Thompson. Thus, on the facts before us, the trade-in vehicle's value as stated in the contract was improperly determined and fraudulently disclosed.

[18] The hidden costs passed on to Thompson were, in reality, 10,000 RV's losses resulting from its agreement to purchase the trade-in vehicle at a price higher than its value.

disclose to the customer the value the trade-in vehicle has to the dealer and how any variation from that value will affect the buyer's total downpayment, including payment of any prior credit balance remaining on the trade-in vehicle. (§ 2982, subd. (a)(6)(A)–(G).) What the dealer cannot do, as was done here, is value a trade-in vehicle at a figure that has no relationship to the true value to the dealer. Further, the dealer cannot use this fictitious "agreed" value to accommodate the buyer's financing needs, and then hide that amount in the cash price of the vehicle being purchased.

No evidence was presented at trial that the $54,000 trade-in value was bargained for or negotiated to be the "agreed" value or that other factors affected the value of the Shasta that Thompson was trading in. Rather, 10,000 RV admitted it determined a trade-in value by overvaluing the Shasta for financing purposes and then it recaptured that amount in the cash price of the Safari. Although the parties "ultimately agreed" on a trade-in allowance for the Shasta, the absence of full and fair disclosure prevented Thompson from having any meaningful choice in the purchase transaction.

■ "The fact that a false statement may be obviously false to those who are trained and experienced does not change its character, nor take away its power to deceive others less experienced. There is no duty resting upon a citizen to suspect the honesty of those with whom he [or she] transacts business. Laws are made to protect the trusting as well as the suspicious. [T]he rule of *caveat emptor* should not be relied upon to reward fraud and deception." (*Federal Trade Commission v. Standard Ed. Soc.* (1937) 302 U.S. 112, 116 [82 L.Ed. 141, 58 S.Ct. 113, 25 F.T.C. 1715]; see *Lavie v. Proctor & Gamble Co.* (2003) 105 Cal.App.4th 496, 509 [129 Cal.Rptr.2d 486].) The fraudulent and deceptive practice that occurred here is precisely what the spirit and policy of the ASFA is meant to address. (See *Hernandez v. Atlantic Finance Co., supra,* 105 Cal.App.3d at p. 75 [the ASFA was designed "to protect the unwary naive purchaser"]; *Lande v. Jurisich* (1943) 59 Cal.App.2d 613, 617 [139 P.2d 657] [remedial statute must be liberally construed so as to suppress the mischief at which it is directed and advance or extend the remedy provided].) The court properly found, on these facts, the value of the Shasta to 10,000 RV should have been its trade-in value and consequently its agreed value. Failure to use this value resulted in a contract that did not contain fair and accurate disclosures.[19]

---

[19] In addition to finding 10,000 RV's acts and practices of including trade-in over-allowances in the cash price of its vehicles violated the ASFA, the court found, as a separate and independent basis for its injunction, that the continuing nature of these acts was fraudulent. Thus, violation of the ASFA was not the only ground on which the injunction was issued.

## VIII

### *Negative Equity*

10,000 RV contends the concept of negative equity is irrelevant to this case because Thompson owed $46,000 on her trade-in vehicle and the value assigned to it was $54,000, resulting in *positive* equity of $8,000 as disclosed in the contract.[20] 10,000 RV asserts that even if there was negative equity, the ASFA does not prohibit adding a trade-in allowance to the sales price of the vehicle being purchased.

Negative equity in a sales transaction involving a trade-in vehicle results when the loan balance on the buyer's trade-in vehicle is greater than its value. Here, the loan balance on Thompson's trade-in vehicle was $46,000 and its value was $30,000, resulting in negative equity of $16,000. However, by overvaluing the trade-in vehicle, 10,000 RV was able to manipulate the numbers to eliminate the appearance of any negative equity. In reality, the transaction reflected *undisclosed* negative equity in the contract.

When the Legislature amended the ASFA in 1999 to revise the definition of "cash price" and the requirements for itemizing the amount financed, its purpose was "to clarify how a creditor deals with the financing of the vehicle if a trade-in is involved in a credit sale transaction and the amount of an existing lien on the vehicle exceeds the value of the trade-in." (Sen. Com. on Judiciary, Analysis of Sen. Bill No. 1092 (1999–2000 Reg. Sess.) as amended Apr. 27, 1999, p. 2.) The amendment provides for "negative equity financing" when, in addition to financing the purchase of a new vehicle, the creditor agrees to finance the remaining credit owing on the vehicle being traded in. (*Id.*, p. 3.) The amended statute conforms with Regulation Z, which permits the financing of prior credit balances on trade-in vehicles as long as the amount financed is clearly and separately disclosed in the "itemization of amount financed." (Official staff interpretation, 12 C.F.R. § 226.18(c) (Supp. I 2005).)

10,000 RV did not purport to finance Thompson's negative equity. The contract did not disclose, under " 'itemization of the amount financed' " (§ 2982, subd. (a)), that the remaining credit owed on Thompson's trade-in

---

[20] 10,000 RV has never disputed Thompson was "upside down" in this transaction, meaning she owed more on the trade-in vehicle than it was worth. Although admitting Thompson had negative equity in the trade-in vehicle, 10,000 RV argued it was entitled to show on the contract a higher value for the vehicle, creating positive equity, because that value was mutually agreed to and therefore no other disclosures were required under the ASFA. However, as we previously discussed, the overvaluation of the trade-in vehicle was created by 10,000 RV solely to make it appear Thompson had positive equity for purposes of financing.

vehicle was being financed in the purchase of the Safari. (§ 2982, subd. (a)(1)(G).) Instead, the true negative equity was hidden by adding it back into the cash price of the Safari, increasing the cash price with a finance charge. Because the contract contained undisclosed negative equity, neither Thompson nor the lender could have known the financing included the amount owing on the trade-in vehicle as well as a portion of the purchase price of the Safari.

■ Although financing properly disclosed negative equity is permissible under the ASFA and Regulation Z, it is not permissible to include the over-allowance in the cash price of a vehicle. This interpretation of the ASFA is consistent with its remedial purpose of protecting consumers from inaccurate and unfair credit practices through full and honest disclosures. Allowing a dealer to include over-allowances on trade-in vehicles in the cash price of vehicles being purchased adversely affects consumers who are funded long-term loans for which they otherwise may not qualify and which they may not be able to afford. Additionally, this practice negatively impacts lenders who extend credit for sales misrepresented to them based on fictitious values of vehicles being financed. As the evidence at trial showed, lenders cannot determine fraud from the face of a contract when the numbers have been manipulated. Finally, and of no less import, enforcing the ASFA's disclosure requirements protects dealership competitors who are at a disadvantage if they quote a true trade-in value rather than an inflated one. Requiring a meaningful disclosure of credit terms both protects consumers and enhances fair business competition. (15 U.S.C. § 1601(a).) In this regard, the injunction properly prohibits 10,000 RV from including over-allowances on trade-in vehicles in the cash price of vehicles being purchased in a credit transaction.

IX

*The Contract Did Not Contain Proper Disclosures*

10,000 RV contends the disclosures in the contract complied with the ASFA in the following respects: (1) no amount was required to be disclosed on line 1G because Thompson had no prior credit balance on her trade-in vehicle (see appen., *post*, p. 982); (2) the $54,000 "agreed value" of the trade-in vehicle was properly disclosed on line 6A (*id.*, p. 983); (3) a total downpayment of $21,000 was properly disclosed by adding lines 6C through 6G (*ibid.*); and (4) the "amount financed" was properly disclosed based on the $93,398 cash price mutually agreed upon.

10,000 RV's assertions are based on several erroneous assumptions. 10,000 RV should have disclosed on line 1G of the contract that Thompson had a prior credit balance on her trade-in vehicle because she owed $46,000 on the Shasta and its value was $30,000. (§ 2982, subd. (a)(1)(G); see appen., *post*, p. 982.) A trade-in value of $54,000 was improperly disclosed on line 6A of the conditional sale contract because 10,000 RV admitted the trade-in vehicle had been intentionally overvalued to secure financing. (§ 2982, subd. (a)(6)(A); see appen., *post*, p. 983.) Thus, the net agreed value of the trade-in vehicle should have been stated on line 6C as a negative number. (§ 2982, subd. (a)(6)(C); see appen., *post*, p. 983.) Thompson's total downpayment was disclosed in the contract as $21,000 only because 10,000 RV manipulated the numbers to show she had $8,000 in positive equity that was added to her $13,000 cash downpayment. In reality, the total downpayment was a negative number, requiring disclosure of zero on line 6 of the contract. (§ 2982, subd. (a)(6)(G); see appen., *post*, p. 983.) Itemization of the amount financed was inaccurately disclosed because the $93,398 cash price on line 1A1 of the contract was inflated to reflect the over-allowance 10,000 RV assigned to Thompson's trade-in vehicle.[21] (§ 2982, subd. (a)(8); see appen., *post*, p. 982.)

The ASFA requires disclosure of the amount being financed as well as how that amount is calculated through specific itemization. In this regard, it protects against *inaccurate* and unfair credit practices. (See 15 U.S.C. § 1601(a).) Here, the true cost of credit to Thompson was not reflected in the contract because 10,000 RV did not properly identify and disclose the finance charge in the transaction, thus violating the ASFA and constituting an unfair business practice.

## X

*The Injunction Was Neither Vague Nor Unenforceable*

An injunction must be narrowly drawn to give the party enjoined reasonable notice of what conduct is prohibited. (*Schmidt v. Lessard* (1974) 414 U.S. 473, 476 [38 L.Ed.2d 661, 94 S.Ct. 713].) 10,000 RV seeks to have

---

[21] At oral argument, counsel for 10,000 RV correctly pointed out the contract that the ASFA requires dealerships to use contains no line on which to disclose an over-allowance. But this is because creating an over-allowance by artificially inflating the true value of a trade-in vehicle to eliminate negative equity solely to obtain financing results in an unlawful credit practice under the ASFA. As we previously discussed, 10,000 RV manipulated the numbers here to eliminate any negative equity, which should have been disclosed on line 1G. (See appen., *post*, p. 982.)

the injunction dissolved, contending it is unenforceable because it is too vague to give notice of the particular conduct prohibited. 10,000 RV asserts the court invented the term "trade-in over[-]allowance," which has no support in the relevant statutes and is based on imaginary values.

The alleged violations of the ASFA, CLRA and UCL were thoroughly litigated in the trial court. Leffingwell, 10,000 RV's sales manager, acknowledged his understanding and use of "over-allowances" in sales transactions involving trade-in vehicles. He described a trade-in over-allowance as the difference between the trade-in vehicle's value as stated in the contract and the dealer's evaluation of the vehicle's value. Leffingwell and Brady (10,000 RV's vice-president) admitted it was their practice to manipulate numbers and include over-allowances in the cash price of the vehicles they sell. They use this practice for credit buyers, but not for cash buyers, as an accommodation to help credit buyers show the lender positive equity. Thompson's expert clearly and thoroughly explained how this practice violated the ASFA and Regulation Z. Thus, the term "trade-in over[-]allowance" is readily understood in the context of violating the disclosure laws.

In its statement of decision, the court described the acts and practices that constituted 10,000 RV's violations of the ASFA and resulted in "fraudulent and unfair acts as those terms are defined by law." Based on these described acts and their continuing nature, the court issued an injunction prohibiting 10,000 RV from including over-allowances on trade-in vehicles in the cash price of vehicles it sells. The injunction is enforceable because it specifically sets forth and narrowly proscribes the particular conduct prohibited. The injunction relates only to credit and not cash sales and 10,000 RV does not contend the injunction is overbroad because it does not specifically limit its application to credit sales.

XI

*The Injunction Was Proper Under the CLRA*

In its amicus curiae brief, California Motor Car Dealers Association suggests the injunction is improper under the UCL following the recent passage of Proposition 64 because Thompson did not comply with class action procedures. However, we need not decide whether Proposition 64 applies here because the court's injunction was proper under the CLRA.

## DISPOSITION

The judgment is affirmed. Thompson is entitled to costs on appeal.

McDonald, Acting P. J., and McIntyre, J., concurred.

# APPENDIX

RETAIL INSTALLMENT SALE CONTRACT
SIMPLE INTEREST FINANCE CHARGE

Dealer Number _____ Contract Number _____ R.O.S. Number _____ Stock Number 3410

Buyer (and Co-Buyer, if any) Name and Address (including County and Zip Code) | Creditor-Seller (Name and Address)

REIH SIN
13835 BINGH ANN
FARMERS RANCH TX 75234

TD LEO RV SALES INC
2962 CONVOY ST
SAN DIEGO CA 92111

You, the Buyer (and Co-Buyer, if any), may buy the vehicle below for cash or on credit. By signing this contract, you choose to buy the vehicle on credit under the agreements on the front and back of this contract. You agree to pay the Creditor – Seller (sometimes "we" or "us" in this contract) the Amount Financed and Finance Charge according to the payment schedule below. We will figure your finance charge on a daily basis. The Truth-in-Lending Disclosures below are part of this contract.

| New/Used | Year | Make and Model | Odometer | Vehicle Identification Number | Primary Use For Which Purchased |
|---|---|---|---|---|---|

## FEDERAL TRUTH-IN-LENDING DISCLOSURES

| ANNUAL PERCENTAGE RATE The cost of your credit as a yearly rate. | FINANCE CHARGE The dollar amount the credit will cost you. | Amount Financed The amount of credit provided to you or on your behalf. | Total of Payments The amount you will have paid after you have made all payments as scheduled. | Total Sale Price The total cost of your purchase on credit, including your down payment of $10,000.00 |
|---|---|---|---|---|
| 9.25 % | $ 191694.59 | $ 69968.68 | $ 185943.26 | $ 287943.26 |

(e) means an estimate

### YOUR PAYMENT SCHEDULE WILL BE:

| Number of Payments | Amount of Payments | When Payments Are Due |
|---|---|---|
| One Payment of | N/A | |
| One Payment of | N/A | |
| 239 Payments | 778.93 | Monthly, Beginning |
| One Final Payment | 778.93 | |

Late Charges. If payment is not received in full within 10 days after it is due, you will pay a late charge of 5% of the part of the payment that is late.

Prepayment. If you pay off all your debt early, you may be charged a minimum finance charge.

Security Interest. You are giving a security interest in the vehicle being purchased.

Additional Information: See this contract for more information including information about nonpayment, default, any required repayment in full before the scheduled date, minimum finance charge, and security interest.

## ITEMIZATION OF THE AMOUNT FINANCED

1. Total Cash Price
 A. Cash Price of Motor Vehicle and Accessories
 1. Cash Price Vehicle $ 93098.58
 2. Cash Price Accessories $ N/A
 B. Document Preparation Fee (not a governmental fee) $
 C. Smog Fee Paid to Seller $
 D. Sales Tax (on A + B + C) $
 E. Luxury Tax $
 F. Service Contract (optional) $
 G. Prior Credit or Lease Balance paid by Seller to
 _____
 (see downpayment and trade-in calculation)
 H. Other (to whom paid) $
 For _____
 Total Cash Price (A through H) $

2. Amounts Paid to Public Officials
 A. License Fees ESTIMATED $
 B. Registration/Transfer/Titling Fees $
 C. Smog Impact Fee $
 D. Other _____ $
 E. Other _____ $
 Total Official Fees (A through E) $

3. Amount Paid to Insurance Companies
 (Total premiums from Statement of Insurance columns A + B) $

4. Smog Certification Fee Paid to State $

5. Subtotal (1 through 4) $

### STATEMENT OF INSURANCE

NOTICE: No person is required as a condition of financing the purchase of a motor vehicle to purchase or negotiate insurance through a particular insurance company, agent or broker.

#### Vehicle Insurance

| | Term | Premium |
|---|---|---|
| Comp, Fire & Theft | | N/A |
| Ded. Collision | | N/A |
| Bodily Injury | | N/A |
| Property Damage | | N/A |
| Medical | | N/A |
| Total Vehicle Insurance Premiums | | $ |

UNLESS A CHARGE IS INCLUDED IN THIS AGREEMENT FOR PUBLIC LIABILITY OR PROPERTY DAMAGE INSURANCE PAYMENT FOR SUCH COVERAGE IS NOT PROVIDED BY THIS AGREEMENT.

You may buy the physical damage insurance this contract requires (see back) from anyone you choose who is acceptable to us. You are not required to buy any other insurance to obtain credit.

Buyer X _____
Co-Buyer X _____

If any insurance is checked below, policies or certificates from the named insurance companies will describe the terms and conditions.

#### Application for Optional Credit Insurance

☐ Credit Life: ☐ Buyer ☐ Co-Buyer ☐ Both
☐ Credit Disability (Buyer Only)

| | Term | Exp | Premium |
|---|---|---|---|
| Credit Life | | | N/A |
| Credit Disability | | | N/A |
| Total Credit Insurance Premiums $ | | | |

Insurance Company Name _____

Home Office Address _____

Credit life insurance and credit disability insurance are not required to obtain credit. They will not be provided unless you sign and agree to pay the extra cost. Credit life insurance is based on your original payment schedule. This insurance may not pay all you owe on this contract if you make late payments. Credit disability insurance does not cover any increase in your payment or in the number of payments. Coverage for credit life insurance and credit disability insurance ends on the original due date for the last payment unless a different term for the insurance is shown above.

You are applying for the credit insurance marked above. Your signature below means that you agree that: (1) You are not eligible for insurance if you have reached your 65th birthday. (2) You are eligible for disability insurance only if you are working for wages or profit 30 hours a week or more on the Effective Date. (3) Only the Primary Buyer is eligible for disability insurance. DISABILITY INSURANCE MAY NOT COVER CONDI-

Exhibit 2
00019

6. Total Downpayment

A. Gross Trade-In Yr ___ Make _____ CHRSTR $ _____
 Model ___ 29 ___ Oh. ___
 VIN _____
B. Less Prior Credit or Lease Balance $ _____
C. Net Trade-In (A less B) (indicate if a negative number) $ _____
D. Deferred Downpayment $ _____
E. Manufacturer's Rebate $ _____
F. Other _____ $ _____
G. Cash $ _____
Total Downpayment (C through G) $ _____
If negative, enter zero on line 6 and enter the amount less from zero as a positive number on line 1D (enter)

7. Amount Financed (5 less 6) $ _____
"Seller may keep part of these amounts.

| SELLER ASSISTED LOAN | AUTO BROKER FEE DISCLOSURE |
|---|---|
| BUYER MAY BE REQUIRED TO PLEDGE SECURITY FOR THE LOAN, AND WILL BE OBLIGATED FOR THE INSTALLMENT PAYMENTS ON BOTH THIS RETAIL INSTALLMENT SALE CONTRACT AND THE LOAN. Proceeds of Loan Paid _____ Amount $ _____ Finance Charge $ _____ Total $ _____ installments of $ _____ from this Loan is shown in item 6D. | If this contract reflects the retail sale of a new motor vehicle, the sale is not subject to a fee received by an autobroker from us unless the following box is checked: ☐ Name of autobroker receiving fee, if applicable: N/A |

NOTICE OF RESCISSION RIGHTS
If Buyer and Co-Buyer sign here, the provisions of the Rescission Rights section on the back giving the Seller the right to rescind if Seller is unable to assign this contract to a financial institution will apply.

Buyer X _____ Co-Buyer X _____

OPTION: ☐ You pay no finance charge if the Amount Financed, item 7, is paid in full on or before _____ Year _____ SELLER'S INITIALS _____

THE MINIMUM PUBLIC LIABILITY INSURANCE LIMITS PROVIDED IN LAW MUST BE MET BY EVERY PERSON WHO PURCHASES A VEHICLE. IF YOU ARE UNSURE WHETHER OR NOT YOUR CURRENT INSURANCE POLICY WILL COVER YOUR NEWLY ACQUIRED VEHICLE IN THE EVENT OF AN ACCIDENT, YOU SHOULD CONTACT YOUR INSURANCE AGENT.
WARNING:
YOUR PRESENT POLICY MAY NOT COVER COLLISION DAMAGE OR MAY NOT PROVIDE FOR FULL REPLACEMENT COSTS FOR THE VEHICLE BEING PURCHASED. IF YOU DO NOT HAVE FULL COVERAGE, SUPPLEMENTAL COVERAGE FOR COLLISION DAMAGE MAY BE AVAILABLE TO YOU THROUGH YOUR INSURANCE AGENT OR THROUGH THE SELLING DEALER. HOWEVER, UNLESS OTHERWISE SPECIFIED, THE COVERAGE YOU OBTAIN THROUGH THE DEALER PROTECTS ONLY THE DEALER, USUALLY UP TO THE AMOUNT OF THE UNPAID BALANCE REMAINING AFTER THE VEHICLE HAS BEEN REPOSSESSED AND SOLD.
FOR ADVICE ON FULL COVERAGE THAT WILL PROTECT YOU IN THE EVENT OF LOSS OR DAMAGE TO YOUR VEHICLE, YOU SHOULD CONTACT YOUR INSURANCE AGENT.
THE BUYER SHALL SIGN TO ACKNOWLEDGE THAT HE/SHE UNDERSTANDS THESE PUBLIC LIABILITY TERMS AND CONDITIONS.

B/S X _____ X _____

Notice to buyer:
(1) Do not sign this agreement before you read it or if it contains any blank spaces to be filled in. (2) You are entitled to a completely filled in copy of this agreement. (3) You can prepay the full amount due under this agreement at any time. (4) If you default in the performance of your obligations under this agreement, the vehicle may be repossessed and you may be subject to suit and liability for the unpaid indebtedness evidenced by this agreement.

If you have a complaint concerning this sale, you should try to resolve it with the seller.
Complaints concerning unfair or deceptive practices or methods by the seller may be referred to the city attorney, the district attorney, or an investigator for the Department of Motor Vehicles, or any combination thereof.
After this contract is signed, the seller may not change the financing or payment terms unless you agree in writing to the change. You do not have to agree to any change, and it is an unfair or deceptive practice for the seller to make a unilateral change.

Buyer Signature X _____ Co-Buyer Signature X _____

| THERE IS NO COOLING OFF PERIOD |
|---|
| California law does not provide for a "cooling off" or other cancellation period for vehicle sales. Therefore, you cannot later cancel this contract simply because you change your mind, decide the vehicle costs too much, or wish you had acquired a different vehicle. After you sign below, you may only cancel this contract with the agreement of the seller or for legal cause, such as fraud. |

Buyer Signature X _____ Date 05/11/99 Buyer Signature X _____ Date _____

Co-Buyers and Other Owners — A co-buyer is a person who is responsible for paying the entire debt. An other owner is a person whose name is on the title to the vehicle but does not have to pay the debt. The co-buyer or other owner knows that the Creditor has a security interest in the vehicle and consents to the security interest.

Other Owner Signature X _____ Address _____
Seller Signature X _____ Date 05/11/99 By _____ Title _____

LAW FORM NO. 553-CA 1/00

CUSTOMER COPY

TIONS FOR WHICH YOU HAVE SEEN A DOCTOR OR CHIROPRACTOR IN THE LAST 6 MONTHS (Refer to "Total Disabilities Not Covered" in your policy for details).

| Date | Buyer Signature | Age |
| X _____ | | |
| Date | Co-Buyer Signature | Age |

OPTIONAL GAP CONTRACT A gap contract (debt cancellation contract) is not required to obtain credit and will not be provided unless you sign below and agree to pay the extra cost. If you choose to buy a gap contract, the cost is shown in item 1K. See your gap contract for details on the protection it provides.

Term _____ Mos. Name of Gap Contract _____
Buyer X _____

SERVICE CONTRACT (Optional) You want to purchase a service contract which with the following company for the term shown below for the price shown below if:
Company _____ USA TRAVEL CARE
Term _____ 36 Price _____ 1600.00
Buyer X _____

HOW THIS CONTRACT CAN BE CHANGED. This contract contains the entire agreement between you and us relating to this contract. Any change to the contract must be in writing and both you and we must sign it. No oral changes are binding.

X _____ X _____
Buyer Initials Co-Buyer Initials

YOU ACKNOWLEDGE THAT YOU HAVE READ BOTH SIDES OF THIS CONTRACT BEFORE SIGNING BELOW.

YOU ACKNOWLEDGE RECEIPT OF A TRUE AND COMPLETELY FILLED IN COPY OF THIS CONTRACT AND EVERY OTHER DOCUMENT THAT YOU SIGNED DURING CONTRACT NEGOTIATIONS.

## OTHER IMPORTANT AGREEMENTS

1. **FINANCE CHARGE AND PAYMENTS**
 a. **How we will figure Finance Charge.** We will figure the Finance Charge on a daily basis at the Annual Percentage Rate on the unpaid part of the Amount Financed.
 b. **How we will apply payments.** We may apply each payment to the earned and unpaid part of the Finance Charge, to the unpaid part of the Amount Financed and to other amounts you owe under this contract in any order we choose.
 c. **How late payments or early payments change what you must pay.** We based the Finance Charge, Total of Payments, and Total Sale Price shown on the front on the assumption that you will make every payment on the day it is due. Your Finance Charge, Total of Payments, and Total Sale Price will be more if you pay late and less if you pay early. Changes may take the form of a larger or smaller final payment or, at our option, more or fewer payments of the same amount as your scheduled payment with a smaller final payment. We will send you a notice telling you about these changes before the final scheduled payment is due.
 d. **You may prepay.** You may prepay all or part of the unpaid part of the Amount Financed at any time. If you do so, you must pay the earned and unpaid part of the Finance Charge and all other amounts due up to the date of your payment. As of the date of your payment, if the minimum finance charge is greater than the earned Finance Charge, you may be charged the difference; the minimum finance charge is as follows: (1) $25 if the original Amount Financed does not exceed $1,000, (2) $50 if the original Amount Financed is more than $1,000 but not more than $2,000, or (3) $75 if the original Amount Financed is more than $2,000.

2. **YOUR OTHER PROMISES TO US**
 a. **If the vehicle is damaged, destroyed, or missing.** You agree to pay us all you owe under this contract even if the vehicle is damaged, destroyed, or missing.
 b. **Using the vehicle.** You agree not to remove the vehicle from the U.S. or Canada, or to sell, rent, lease, or transfer any interest in the vehicle or this contract without our written permission. You agree not to expose the vehicle to misuse, seizure, confiscation, or involuntary transfer. If we pay any repair bills, storage bills, taxes, fines, or charges on the vehicle, you agree to repay the amount when we ask for it.
 c. **Security Interest.**
 You give us a security interest in:
 - The vehicle and all parts or goods installed on it;
 - All money or goods received (proceeds) for the vehicle;
 - All insurance or service or gap contracts we finance for you; and
 - All proceeds from insurance or service or gap contracts we finance for you. This includes any refunds of premiums.

 This secures payment of all you owe on this contract. It also secures your other agreements in this contract as the law allows. You will make sure the title shows our security interest (lien) in the vehicle.
 d. **Insurance you must have on the vehicle.**
 You agree to have physical damage insurance covering loss of or damage to the vehicle for the term of this contract. The insurance must cover our interest in the vehicle. If you do not have this insurance, we may, if we choose, buy physical damage insurance. If we decide to buy physical damage insurance, we may either buy insurance that covers your interest and our interest in the vehicle, or buy insurance that covers only our interest. If we buy either type

We will take the vehicle if you do not get it back. If you do not return it, we will sell the vehicle. We will send you a written notice of sale before selling the vehicle. We will apply the money from the sale, less allowed expenses, to the amount you owe. Allowed expenses are expenses we pay as a direct result of taking the vehicle, holding it, preparing it for sale, and selling it. Attorney fees and court costs the law permits are also allowed expenses. If any money is left (surplus), we will pay it to you unless the law requires us to pay it to someone else. If money from the sale is not enough to pay the amount you owe, you must pay the rest to us. If you do not pay this amount when we ask, we may charge you interest at the Annual Percentage Rate shown on the face of this contract, not to exceed the highest rate permitted by law, until you pay.

g. **What we may do about optional insurance or service or gap contracts.** This contract may contain charges for optional insurance or service or gap contracts. If we repossess the vehicle you agree that we may claim benefits under these contracts and cancel them to obtain refunds of unearned charges to reduce what you owe or repair the vehicle.

4. **WARRANTIES SELLER DISCLAIMS**
 If you do not get a written warranty, and the Seller does not enter into a service contract within 90 days from the date of this contract, the Seller makes no warranties, express or implied, on the vehicle, and there will be no implied warranties of merchantability or of fitness for a particular purpose.
 This provision does not affect any warranties covering the vehicle that the vehicle manufacturer may provide.

5. **Used Car Buyers Guide.** The information you see on the window form for this vehicle is part of this contract. Information on the window form overrides any contrary provisions in the contract of sale.
 Spanish Translation: Guía para compradores de vehículos usados. La información que ve en el formulario de la ventanilla para este vehículo forma parte del presente contrato. La información del formulario de la ventanilla deja sin efecto toda disposición en contrario contenida en el contrato de venta.

6. **Applicable Law**
 Federal law and California law apply to this contract. If any part of this contract is not valid, all other parts stay valid. We may delay or refrain from enforcing any of our rights under this contract without losing them. For example, we may extend the time for making some payments without extending the time for making others.

7. **Warranties of Buyer.** You promise you have given true and correct information in your application for credit, and you have no knowledge that will make that information untrue in the future. We have relied on the truth and accuracy of that information in entering into this contract. Upon request, you will provide us with documents and other information necessary to verify any item contained in your credit application. You promise you have given a true payoff amount on any vehicle traded in. If that payoff is more than the amount shown in item 6.B. on the front of this contract, you must pay us the excess upon demand.

You waive the provisions of Calif. Vehicle Code Section 1808.21 and authorize the California Department of Motor Vehicles to furnish your residence address to us.

### CREDIT DISABILITY INSURANCE NOTICE
### CLAIM PROCEDURE
If you become disabled, you must tell us right away. (You are advised to send this information to the same address to which you are normally required to send your payments, unless a different address or telephone number is given to you in writing by us as the location where we would like to be notified.) We

charge you must pay. The charge will be the premium for the insurance and finance charge at the Annual Percentage Rate shown on the front of this contract. If the vehicle is lost or damaged, you agree that we may use any insurance settlement to reduce what you owe or repair the vehicle.

 e. What happens to returned insurance or service or gap contract charges. If we obtain a refund on insurance or service or gap contracts, we will subtract the refund from what you owe.

3. **IF YOU PAY LATE OR BREAK YOUR OTHER PROMISES**

 a. You may owe late charges. You will pay a late charge on each late payment as shown on the front. Acceptance of a late payment or late charge does not excuse your late payment or mean that you may keep making late payments. If you pay late, we may also take the steps described below.

 b. You may have to pay all you owe at once. If you break your promises (default), we may demand that you pay all you owe on this contract at once, subject to any right the law gives you to reinstate this contract. Default means:

 • You do not pay any payment on time;
 • You start a proceeding in bankruptcy or one is started against you or your property; or
 • You break any agreements in this contract.

 The amount you will owe will be the unpaid part of the Amount Financed plus the earned and unpaid part of the Finance Charge, any late charges, and any amounts due because you defaulted.

 c. You may have to pay collection costs. You will pay our reasonable costs to collect what you owe, including attorney fees, court costs, collection agency fees, and fees paid for other reasonable collection efforts. You agree to pay a charge not to exceed $15 if any check you give to us is dishonored.

 d. We may take the vehicle from you. If you default, we may take (repossess) the vehicle from you if we do so peacefully. If your vehicle has an electronic tracking device, you agree that we may use the device to find the vehicle. If we take the vehicle, any accessories, equipment, and replacement parts will stay with the vehicle. If any personal items are in the vehicle, we may store them for you at your expense. If you do not ask for these items back, we may dispose of them as the law allows.

 e. How you can get the vehicle back if we take it. If we repossess the vehicle, you may pay to get it back (redeem). You may redeem the vehicle by paying all you owe, or you may have the right to reinstate this contract and redeem the vehicle by paying past due payments and any late charges, providing proof of insurance, and/or taking other action to cure the default. We will provide you all notices required by law to tell you when and how much to pay and/or what action you must take to redeem the vehicle.

completed form to the insurance company as soon as possible and tell us soon as you do.

If your disability insurance covers all of your missed payment(s), WE CANNOT TRY TO COLLECT WHAT YOU OWE OR FORECLOSE UPON OR REPOSSESS ANY COLLATERAL UNTIL THREE CALENDAR MONTHS AFTER your first missed payment is due or until the insurance company pays or rejects your claim, whichever comes first. We can, however, try to collect, foreclose, or repossess if you have any money due and owing us or are otherwise in default when your disability claim is made or if a senior mortgage or lien holder is foreclosing.

If the insurance company pays the claim within the three calendar months, we must accept the money as though you paid on time. If the insurance company rejects the claim within the three calendar months or accepts the claim within the three calendar months on a partial disability and pays less than for a total disability, you will have 35 days from the date that the rejection or the acceptance of the partial disability claim is sent to pay past due payments, or the difference between the past due payments and what the insurance company pays for the partial disability, plus late charges. You can contact us, and we will tell you how much you owe. After that time, we can take action to collect or foreclose or repossess any collateral you may have given.

If the insurance company accepts your claim but requires that you send in additional forms to remain eligible for continued payments, you should send in these completed additional forms no later than required. If you do not send in these forms on time, the insurance company may stop paying, and we will then be able to take action to collect or foreclose or repossess any collateral you may have given.

---

### Rescission Rights

 a. Seller agrees to deliver the vehicle to you on the date this contract is signed by Seller and you. You understand that it may take a few days for Seller to verify your credit and assign the contract. You agree that if Seller is unable to assign the contract to any one of the financial institutions with whom Seller regularly does business under an assignment acceptable to Seller, Seller may rescind (cancel) the contract.

 b. Seller shall give you written notice (or in any other manner in which actual notice is given to you) within 10 days of the date this contract is signed if Seller elects to rescind. Upon receipt of such notice, you must immediately return the vehicle to Seller in the same condition as when sold, reasonable wear and tear excepted. Seller must give back to you all consideration received by Seller, including any trade-in vehicle.

 c. If you do not immediately return the vehicle, you shall be liable for all expenses incurred by Seller in taking the vehicle from you, including reasonable attorney's fees.

 d. While the vehicle is in your possession, all terms of the contract, including those relating to use of the vehicle and insurance for the vehicle, shall be in full force and you shall assume all risk of loss or damage to the vehicle. You must pay all reasonable costs for repair of any damage to the vehicle until the vehicle is returned to Seller.

---

**NOTICE: ANY HOLDER OF THIS CONSUMER CREDIT CONTRACT IS SUBJECT TO ALL CLAIMS AND DEFENSES WHICH THE DEBTOR COULD ASSERT AGAINST THE SELLER OF GOODS OR SERVICES OBTAINED PURSUANT HERETO OR WITH THE PROCEEDS HEREOF. RECOVERY HEREUNDER BY THE DEBTOR SHALL NOT EXCEED AMOUNTS PAID BY THE DEBTOR HEREUNDER.**

The preceding NOTICE applies only if the "personal, family or household" box in the "Primary Use for Which Purchased" section of this contract is checked. In all other cases, Buyer will not assert against any subsequent holder or assignee of this contract any claims or defenses the Buyer (debtor) may have against the Seller, or against the manufacturer of the vehicle or equipment obtained under this contract.

| Seller assigns its interest in this contract to | | (Assignee) at (address) |
|---|---|---|
| | | under the terms of Seller's agreement(s) with Assignee. |
| ☐ Assigned with recourse | ☐ Assigned without recourse | ☐ Assigned with limited recourse |
| Seller | by | Title |

no. 553-CA 1/00