[No. C058026. Third Dist. Nov. 30, 2009.]

CAROLYN HOLBERT, Plaintiff and Appellant, v.
FREMONT INVESTMENT & LOAN, Defendant and Respondent.

**[CERTIFIED FOR PARTIAL PUBLICATION\*]**

---

\*Pursuant to California Rules of Court, rule 8.1110, this opinion is certified for publication with the exception of parts I, III, and IV of the Discussion.

**COUNSEL**

Goodman & Associates, Karen M. Goodman and Summer D. Haro for Plaintiff and Appellant.

The Ryan Firm, Timothy M. Ryan and Barry G. Coleman for Defendant and Respondent.

## Opinion

**HULL, J.**—Plaintiff Carolyn Holbert appeals from a judgment of dismissal entered after the trial court granted the motion for summary judgment of defendant Fremont Reorganization Corporation, formerly known as Fremont Investment & Loan (Fremont). Plaintiff contends issues of fact remain on her claims for violation of the federal Truth in Lending Act (15 U.S.C. § 1601 et seq.) (TILA), as amended by the Home Ownership and Equity Protection Act of 1994 (15 U.S.C. §§ 1602(aa), 1639) (HOEPA), unfair business practices and financial elder abuse stemming from a home loan issued to plaintiff by Fremont.

We conclude Fremont was not required to comply with HOEPA, which applies when the finance charges imposed on a loan exceed a certain threshold. We conclude two charges imposed on plaintiff, one to pay off a preexisting debt to another lender and another to satisfy a prepayment penalty on a prior home loan, were not finance charges within the meaning of HOEPA.

We further conclude plaintiff has not established a claim against Fremont for unfair business practices. While unfair business practices may include both unlawful and unfair acts, the complaint in this matter alleges only unlawful acts. Furthermore, the alleged unlawful act is a violation of HOEPA, which we conclude did not occur here.

Finally, while plaintiff may have a viable claim against her loan broker for financial elder abuse based on various misrepresentations made during the loan process, she failed to link that claim to Fremont, which is as much a victim of the broker's misrepresentations as plaintiff.

We therefore affirm the judgment of dismissal.

### FACTS AND PROCEEDINGS

On review of a judgment based on an order granting summary judgment, we construe the evidence and reasonable inferences therefrom in the light most favorable to the opposing party. (*Molko v. Holy Spirit Assn.* (1988) 46 Cal.3d 1092, 1107 [252 Cal.Rptr. 122, 762 P.2d 46]; *Sellery v. Cressey* (1996) 48 Cal.App.4th 538, 541, fn. 1 [55 Cal.Rptr.2d 706].)

At the time of the Fremont loan, plaintiff was more than 65 years old and lived in a home in Citrus Heights, California, which she and her husband had

purchased in 1999. Although plaintiff is certified as a notary, she was not employed as such and subsisted on Social Security benefits of $1,137 per month.

In 2003, plaintiff's husband died from a lengthy illness that "severely strained [plaintiff's] financial situation." That year, plaintiff obtained a loan from Ameriquest in the amount of $144,500 secured by a deed of trust on her home in order to pay off various debts. After paying off the prior mortgage and about $5,000 in loan fees, plaintiff received approximately $18,000 in cash out of the Ameriquest loan.

In June 2004, plaintiff again refinanced her home mortgage, this time with a loan from World Savings in the amount of $153,750. After paying off the Ameriquest loan and loan fees of over $3,500, plaintiff received approximately $5,000 in cash.

In February 2005, plaintiff obtained a loan from New Century Mortgage in the amount of $204,000, secured by a deed of trust on her home. After paying off the World Savings loan and other debts and fees of over $9,000, plaintiff received $5,574 in cash out of the loan proceeds. At the time of this loan, plaintiff's home was appraised at $240,000. Plaintiff's initial payments on this new loan were $943.50.

In June 2005, after determining the payments on the New Century loan were more than she could afford, plaintiff entered into a listing agreement for the sale of her home.

On June 7, plaintiff received a call from an employee of California Real Estate Investments & Loans, Inc. (CREIL), about refinancing her home loan. At the time, plaintiff told the caller she was on a fixed income of $1,137 per month and said she was only interested in refinancing if she could reduce her payments while trying to sell the home. The caller said this could be done and CREIL would help plaintiff sell her home.

On July 1, 2005, plaintiff met with Samantha Pham, who informed plaintiff she was the owner of CREIL. Plaintiff told Pham she was living on a fixed income, could not afford her current payments, and needed a single payment that included an impound account for taxes and insurance. Pham directed plaintiff to sign some papers to begin the refinancing process and assured plaintiff she could obtain a loan that would reduce plaintiff's financial

obligations. Pham also represented to plaintiff that the information in the loan documents was consistent with what plaintiff had earlier told CREIL. Plaintiff signed the loan application based on these assurances.

The loan application materials listed the value of plaintiff's property at $265,000. They also represented plaintiff's income as including $4,800 per month as a self-employed notary.

Pham submitted the loan application to Fremont. On July 20, Fremont sent plaintiff documentation listing estimated fees and costs associated with the new loan. This documentation listed total costs and fees of $17,969.32, which included $15,022.50 in broker fees to CREIL.

On July 25, plaintiff again met with Pham, who presented her with a "stack" of loan documents for a loan from Fremont in the amount of $265,000. These documents included revised estimates of fees and costs. Also included with the loan documents was a list of debts to be paid off from the loan proceeds, including a loan from Wells Fargo Bank in the amount of $4,299. The documentation further disclosed a payment of $4,528.80 as a penalty for prepayment of the New Century loan. Pham notarized plaintiff's signature on these documents, for which Pham was paid $300 out of the loan proceeds.

The initial monthly payment on the Fremont loan was $1,916.84, which did not include taxes and insurance. The Fremont loan included a prepayment penalty clause that applied during the first two years of the loan. After payoff of the New Century loan and the costs and fees of the Fremont loan, plaintiff received $31,361.73 in cash out of the loan proceeds.

On the day plaintiff signed the loan documents, Pham deposited $4,500 in plaintiff's bank account and later asked plaintiff for a bank receipt showing the balance in her account. Plaintiff provided the receipt on July 28. On August 2, Pham transferred the $4,500 back out of plaintiff's account.

Pham assured plaintiff she need not worry about the large loan payments, which were well beyond plaintiff's monthly income. Pham told plaintiff she could use the cash she received from the loan proceeds to make the loan payments while Pham helped plaintiff sell her home. However, Pham never assisted plaintiff in selling her home, and plaintiff used up most of the loan proceeds in making the loan payments to Fremont.

During 2006, plaintiff's attempts to sell her home were unavailing, because Fremont refused to consider doing a "short sale" and refused to waive the prepayment penalty on its loan.

On May 9, 2006, plaintiff filed this action against defendant, Pham and CREIL, alleging the Fremont loan is a "high fee" loan subject to HOEPA, thereby triggering special disclosure requirements with which the defendants did not comply. The first two causes of action of the complaint allege fraud and breach of fiduciary duty by Pham and CREIL. The third cause of action alleges a violation of TILA by Fremont. In particular, plaintiff alleges (1) Fremont failed to disclose all costs and fees associated with the loan, (2) the loan charged excessive interest, and (3) the loan included an unlawful prepayment penalty clause. The fourth cause of action alleges predatory lending by all defendants. In particular, plaintiff alleges the defendants violated Financial Code section 4973 by failing to provide necessary consumer cautions regarding the loan. The fifth and sixth causes of action allege unfair business practices and financial elder abuse by all defendants. Finally, the seventh cause of action seeks injunctive and declaratory relief.

On August 28, 2006, the trial court sustained Fremont's demurrer to the fourth cause of action.

On June 15, 2007, Fremont moved for summary judgment or summary adjudication of the third, fifth, sixth, and seventh causes of action. The trial court thereafter issued a tentative ruling granting Fremont's motion. On the third cause of action, the court concluded the payoff of the Wells Fargo loan in the amount of $4,299 was not a "finance charge" associated with the Fremont loan and therefore did not count toward the total costs and fees of the loan. And because the other costs and fees of the loan did not exceed the 8 percent threshold of HOEPA, that act did not apply. Thus, Fremont was not required to make enhanced disclosures and was not prohibited from including a prepayment penalty in the loan.

On the fifth cause of action, the court concluded plaintiff's claim is that Fremont engaged in unfair business practices by virtue of issuing a loan that violated HOEPA. However, because the court concluded there was no HOEPA violation, the fifth cause of action likewise fails.

On the sixth cause of action for elder abuse, the court concluded the evidence is undisputed plaintiff received value for the Fremont loan and signed the loan documents voluntarily. To the extent plaintiff relied on misrepresentations to sign the loan documents, those misrepresentations were made by Pham and CREIL, not Fremont.

Finally, on the seventh cause of action, the court concluded that because of its ruling on the other claims, there is no basis for injunctive or declaratory relief.

Following oral argument, the court took the matter under submission and affirmed the tentative ruling with one addition. At oral argument, plaintiff requested leave to amend her unfair business practices claim. The court denied this request as untimely. The court further indicated it was not convinced the acts of which plaintiff complained amounted to unfair business practices.

Thereafter, according to plaintiff, "after receiving terminating sanctions against Pham and CREIL and having their default entered, [plaintiff] obtained a judgment against Ms. Pham and CREIL."

On December 7, 2007, the trial court entered judgment of dismissal in favor of Fremont.

DISCUSSION

I

*Introduction*[*]

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

II

*TILA and HOEPA Violation*

The first four issues cited by plaintiff concern the proper application of TILA and HOEPA. Plaintiff asserts the cost of paying off the Wells Fargo loan, the New Century prepayment penalty and the notary fees are "finance charges" associated with the Fremont loan. Plaintiff further asserts that adding the amount of these payments to the other finance charges brings the total finance charges above the 8 percent threshold triggering application of HOEPA. Finally, plaintiff asserts Fremont did not comply with HOEPA.

As a general matter, TILA requires lenders to make certain disclosures in connection with consumer loans. (15 U.S.C. § 1638.) Among other things, the

---

[*]See footnote, *ante*, page 1067.

lender must disclose the amount financed (*id.*, § 1638(a)(2)(A)), the "finance charge" (*id.*, § 1638(a)(3)), "[t]he number, amount, and due dates or period of payments scheduled to repay the total of payments" (*id.*, § 1638(a)(6)), and a statement indicating whether or not the debtor is subject to a prepayment penalty (*id.*, § 1638(a)(11)).

■ When a credit transaction includes the lender taking a security interest in the debtor's principal residence, the debtor must also be informed of a right to rescind the transaction. This right applies for up to three days after consummation of the transaction or the date the creditor delivers notice of the right to rescind and the other TILA disclosures, whichever is later, up to a maximum of three years. (15 U.S.C. § 1635.)

Among the stated purposes of TILA is "to assure a meaningful disclosure of credit terms so that the consumer will be able to compare more readily the various credit terms available to him and avoid the uninformed use of credit . . . ." (15 U.S.C. § 1601(a).) Because TILA is "a remedial statute which is designed to balance the scales 'thought to be weighed in favor of lenders,' [it] is to be liberally construed in favor of borrowers." (*Smith v. Fidelity Consumer Discount Co.* (3d Cir. 1990) 898 F.2d 896, 898 (*Smith*).)

In order to further the purposes of TILA, Congress "delegated expansive authority to the Federal Reserve Board to elaborate and expand the legal framework governing commerce in credit." (*Ford Motor Credit Co. v. Milhollin* (1980) 444 U.S. 555, 559–560 [63 L.Ed.2d 22, 28, 100 S.Ct. 790].) Pursuant to this authority, the Federal Reserve Board promulgated rules and regulations collectively known as Regulation Z (12 C.F.R. § 226 (2009)). (*Thompson v. 10,000 RV Sales, Inc.* (2005) 130 Cal.App.4th 950, 965 [31 Cal.Rptr.3d 18].)

■ HOEPA was enacted as an amendment to TILA. (*In re Community Bank of Northern Virginia* (3d Cir. 2005) 418 F.3d 277, 304.) It applies to "a special class of regulated loans that are made at higher interest rates or with excessive costs and fees." (*Ibid.*) In particular, HOEPA applies where "(1) the annual percentage rate ('APR') exceeds by eight percent the yield on Treasury securities of comparable maturity for first-lien loans, or above ten percent for subordinate-lien loans; or (2) the total of all the loan's points and fees exceed eight percent of the loan total or $400 (adjusted for inflation), whichever is greater." (418 F.3d at p. 304, fn. 22, citing 15 U.S.C. § 1602(aa)(1), (3), 12 C.F.R. § 226.32(a)(1)(i), (ii) (2005).)

HOEPA requires additional disclosures that must be made at least three days before consummation of the transaction. (15 U.S.C. § 1639(b)(1).) HOEPA generally precludes any prepayment penalty provision in the loan (15 U.S.C. § 1639(c)), prohibits increases in the interest rate charged following any default (*id.*, § 1639(d)), and bars negative amortization (*id.*, § 1639(f)) and prepaid monthly payments (*id.*, § 1639(g)). Any failure of the creditor to comply with the requirements of HOEPA is treated as a failure to deliver material disclosures, thereby triggering the debtor's right to rescind. (15 U.S.C. § 1639(j).)

█ As noted above, HOEPA applies where the total "points and fees" of the loan exceed 8 percent of the loan amount. (15 U.S.C. § 1602(aa)(1)(B).) "[P]oints and fees" include "all items included in the finance charge, except interest or the time-price differential" (*id.*, § 1602(aa)(4)(A)) and "all compensation paid to mortgage brokers" (*id.*, § 1602(aa)(4)(B)). Under TILA, "finance charge" is defined as "the sum of all charges, payable directly or indirectly by the person to whom the credit is extended, and imposed directly or indirectly by the creditor as an incident to the extension of credit." (15 U.S.C. § 1605(a).) TILA lists the following examples:

"(1) Interest, time price differential, and any amount payable under a point, discount, or other system of additional charges.

"(2) Service or carrying charge.

"(3) Loan fee, finder's fee, or similar charge.

"(4) Fee for an investigation or credit report.

"(5) Premium or other charge for any guarantee or insurance protecting the creditor against the obligor's default or other credit loss.

"(6) Borrower-paid mortgage broker fees, including fees paid directly to the broker or the lender (for delivery to the broker) whether such fees are paid in cash or financed." (15 U.S.C. § 1605(a).)

Plaintiff contends the payoff of the Wells Fargo loan and the New Century prepayment penalty fall within the foregoing definition of finance charge, because they were payable directly or indirectly by the debtor and were imposed directly or indirectly by the creditor as an incident of the Fremont loan. And, plaintiff argues, when these payments are added to the other finance charges imposed by Fremont, the total exceeds the 8 percent threshold of HOEPA.

In *Smith, supra,* 898 F.2d 896, John Coplin obtained a loan from Fidelity secured by a deed on his home. In order to obtain a first priority lien, Fidelity loaned Coplin an additional $3,429.50 to satisfy several preexisting liens on his home. After Coplin's death, his heirs and others brought this action against Fidelity seeking damages and rescission of the loan. The federal district court granted the requested relief, concluding Fidelity failed to disclose all necessary finance charges, including the payoff of preexisting liens. (*Smith, supra,* 898 F.2d at p. 902.)

■ The Third Circuit Court of Appeals reversed in part, concluding the payoff of preexisting liens is not a finance charge required to be disclosed to a debtor under TILA. Regarding the statutory definition of "finance charge," the court stated: "While the statutory language charges 'imposed directly or indirectly [by the creditor] as an incident to the extension of credit' is extremely broad, this language is not unlimited. This is demonstrated by the examples of finance charges listed in conjunction with it. Examining this list, we are left with the firm impression that prior liens are not within the definition of finance charge as that phrase was used by Congress." (*Smith, supra,* 898 F.2d at pp. 905–906.)

The court was also persuaded by the federal regulations, which further elaborate on the examples of finance charges. Title 12 Code of Federal Regulations part 226.4(b) (2009), lists the following:

"(1) Interest, time price differential, and any amount payable under an add-on or discount system of additional charges.

"(2) Service, transaction, activity, and carrying charges, including any charge imposed on a checking or other transaction account to the extent that the charge exceeds the charge for a similar account without a credit feature.

"(3) Points, loan fees, assumption fees, finder's fees, and similar charges.

"(4) Appraisal, investigation, and credit report fees.

"(5) Premiums or other charges for any guarantee or insurance protecting the creditor against the consumer's default or other credit loss.

"(6) Charges imposed on a creditor by another person for purchasing or accepting a consumer's obligation, if the consumer is required to pay the charges in cash, as an addition to the obligation, or as a deduction from the proceeds of the obligation.

"(7) Premiums or other charges for credit life, accident, health, or loss-of-income insurance, written in connection with a credit transaction.

"(8) Premiums or other charges for insurance against loss of or damage to property, or against liability arising out of the ownership or use of property, written in connection with a credit transaction.

"(9) Discounts for the purpose of inducing payment by a means other than the use of credit.

"(10) *Debt cancellation fees.* Charges or premiums paid for debt cancellation coverage written in connection with a credit transaction, whether or not the debt cancellation coverage is insurance under applicable law." (Italics added.)

Finally, the court relied on 12 Code of Federal Regulations part 226.20(a) (2009), which reads: "Refinancings. A refinancing occurs when an existing obligation that was subject to this subpart is satisfied and replaced by a new obligation undertaken by the same consumer. A refinancing is a new transaction requiring new disclosures to the consumer. The new finance charge shall include any unearned portion of the old finance charge that is not credited to the existing obligation." The court reasoned: "The necessary implication from the inclusion of the unearned portion of the old finance charge within the new finance charge—without any mention of the prior debt being part of the new finance charge—is that refinanced debts are not 'finance charges' within the meaning of TILA." (*Smith, supra,* 898 F.2d at p. 906.)

Fremont argues *Smith* supports the trial court's conclusion that payoff of the Wells Fargo loan was not a finance charge within the meaning of TILA. Plaintiff responds that *Smith* is distinguishable inasmuch as it involved payoff of a preexisting *lien* on the debtor's property, whereas the Wells Fargo loan was not secured by her property and, therefore, need not have been paid off upon refinancing of the home mortgage.

██ In *Horton v. First State Bank of Eldorado* (S.D.Ill., Feb. 9, 2006, No. 05-CV-4101-JPG) 2006 U.S.Dist. Lexis 7647 (*Horton*), an unpublished decision of the federal district court, the plaintiff argued the payoff of a preexisting unsecured debt was a finance charge associated with a loan made by the defendant. (See *City of Hawthorne ex rel. Wohlner v. H&C Disposal Co.* (2003) 109 Cal.App.4th 1668, 1678, fn. 5 [1 Cal.Rptr.3d 312] [an unpublished federal court opinion is citable as persuasive, although not precedential, authority].) The district court disagreed. ██ Relying primarily on *Smith*, the court explained: "Though the list in [12 Code of Federal Regulations part] 226.4(b) is not definitive, whether a charge is similar to those listed in the Regulation and the statutes is certainly relevant to the determination of whether a particular charge should be included in that definition. Facially, the consolidation here bears little resemblance to the examples of finance charges listed in Regulation Z." (*Horton,* at p. *19.)

Plaintiff argues *Horton* is distinguishable, because it involved payoff of a preexisting debt owed to the same lender, whereas the preexisting debt here was owed to Wells Fargo, not Fremont. However, that would appear to cut the other way. A payment made to the creditor itself would appear to be more comparable to the types of finance charges listed in the statutes and regulations than a payment made to a third party lender.

We find both *Smith* and *Horton* to be persuasive on the question of whether the payoff of the Wells Fargo loan was a finance charge under TILA. Unlike the other items listed in the statute and regulation, the payoff of a preexisting debt, whether secured or unsecured, is not the creation of a new financial obligation. It is rather the satisfaction of an obligation the debtor had already incurred and, presumably, had notice of. The Wells Fargo debt was paid from proceeds of the Fremont loan. In practical effect, the Wells Fargo indebtedness was replaced by an indebtedness to Fremont of equal value.

As for the prepayment penalty imposed by New Century, this is another matter. Here, we do have an indebtedness that did not exist until plaintiff refinanced with Fremont. Fremont contends the question of whether this is a finance charge is answered by the express language of TILA and the regulations. Under the definition of "finance charge," TILA states: "The finance charge does not include charges of a type payable in a comparable cash transaction." (15 U.S.C. § 1605(a).) The regulations contain a similar statement. (12 C.F.R. § 226.4(a) (2009).) According to Fremont, the New Century prepayment penalty provision "does not discriminate as to whether it is satisfied in cash or with a refinance."

Fremont takes the cited language from the statute and regulation out of context. The clear import of that language is to make clear that, in connection with a consumer *purchase*, a charge imposed by the seller on the consumer regardless of whether he or she pays by cash or credit is not a finance charge. Only charges imposed on a credit sale that are not imposed on a cash sale may be considered finance charges. In the present matter, there is no consumer purchase. And while it is true plaintiff would have been required to pay the prepayment penalty whether she paid off the New Century loan with cash or with funds borrowed from Fremont, the "transaction" at issue here is not the payoff of the New Century loan but the creation of the new Fremont loan. There is no "comparable cash transaction" to the creation of the Fremont loan.

Nevertheless, we agree the prepayment penalty was not a finance charge of the Fremont loan. It was, rather, a charge associated with the New Century loan. Under TILA, New Century was required to disclose the existence of such a prepayment penalty provision at the time of that loan.

(15 U.S.C. § 1638(a)(11).) The TILA regulations list a number of items excluded from the definition of finance charge, including "[i]nterest forfeited as a result of an interest reduction required by law on a time deposit used as security for an extension of credit." (12 C.F.R. § 226.4(c)(6) (2009).) The prepayment penalty paid to New Century was no more a finance charge of the Fremont loan than interest forfeited on a time deposit that is used as collateral for an extension of credit. In both instances, the costs in question are incurred pursuant to the terms of the prior instrument, not the new loan.

Finally, as to the notary fees paid to Pham, plaintiff argues the regulations provide that *all* fees paid to the lender or the broker are counted for purposes of determining HOEPA application. Title 12 Code of Federal Regulations part 226.32(b)(1)(ii) (2009), defines "points and fees" to include "[a]ll compensation paid to mortgage brokers." However, that definition also includes "[a]ll items listed in Sec. 226.4(c)(7) . . . unless the charge is reasonable, the creditor receives no direct or indirect compensation in connection with the charge, and the charge is not paid to an affiliate of the creditor." (12 C.F.R. § 226.32(b)(1)(iii) (2009).) Title 12 Code of Federal Regulations part 226.4(c)(7)(iii) (2009), excludes from the definition of finance charges certain fees associated with a transaction secured by real property, including "[n]otary and credit report fees." Thus, while *all* compensation paid to brokers is included in the computation of points and fees, notary fees are excluded from finance charges where they are reasonable and are not paid to the lender or an affiliate.

We need not decide here if the notary fee paid to Pham should have been included in the calculation of finance charges for purposes of determining HOEPA application. Assuming so, the addition of $300 to the other finance charges would not reach the 8 percent HOEPA threshold.

██ Having concluded the payoff of the Wells Fargo debt and the New Century prepayment penalty were not finance charges associated with the Fremont loan, the total finance charge imposed on plaintiff did not reach the 8 percent threshold required for the application of HOEPA. Thus, Fremont was not required to comply with HOEPA's enhanced disclosure requirements.

III, IV*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

---

*See footnote, *ante*, page 1067.

## DISPOSITION

The judgment is affirmed.

Blease, Acting P. J., and Robie, J., concurred.

A petition for a rehearing was denied December 17, 2009.