Filed 8/31/23  Sweeney v. Regional Water Quality Control Bd. CA1/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| JOHN D. SWEENEY et al.,<br><br>      Plaintiffs, Cross-Defendants, and Appellants,<br><br>v.<br><br>REGIONAL WATER QUALITY CONTROL BOARD, SAN FRANCISCO BAY REGION,<br><br>      Defendant, Cross-Complainant, and Respondent. | A163683<br><br>(Solano County<br>Super. Ct. No. FCS048136) |

John D. Sweeney and the Point Buckler Club, LLC (the Club; collectively, appellants) appeal an order granting an injunction directing them to comply with a cleanup and abatement order (the abatement order) issued by the Regional Water Quality Control Board, San Francisco Bay Region (the Board).  Appellants raise several challenges to the injunction: that the trial court erred in failing to consider equitable factors, including his ability to pay, before issuing it; that the injunction is not narrowly drawn; that the injunction is not supported by the evidence; and that they were deprived of their right to a trial.  The Board, in turn, asks us to apply the disentitlement doctrine to dismiss the appeal because of Sweeney's repeated

1

willful disobedience of court orders. Despite our consternation at Sweeney's defiance of court orders, we decline to exercise our discretion to dismiss the appeal, and we instead consider appellants' contentions. Finding no merit in them, we affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

### I. This Dispute

The facts underlying the injunction were set forth in a decision by a different panel of this division. (*Sweeney v. California Regional Water Quality Control Bd.* (2021) 61 Cal.App.5th 1093 (*Sweeney I*).) Briefly, Sweeney bought an island in Suisun Marsh that had apparently been used previously as a managed wetland for duck hunting. He transferred ownership to the Club, of which he is the managing member, and they began operating the island as a private recreational area for kiteboarding. Wishing to restore the site as a duck hunting club, Sweeney carried out unpermitted development projects on the island, including restoring an exterior levee that had been breached in multiple places. (*Id.* at pp. 1106–1107.)

The San Francisco Bay Conservation and Development Commission (BCDC) inspected the site in 2014 and observed that the levee construction work had removed tidal flow to the site's interior and dried out tidal marsh areas. Taking the position that the site was a tidal marsh rather than a managed wetland, BCDC directed Sweeney to stop work and told him that any work that could not be retroactively approved through the permit process would likely need to be removed and the site restored to tidal marsh. (*Sweeney I, supra,* 61 Cal.App.5th at pp. 1107–1108.)

Separately, the Board began an enforcement proceeding against appellants based on violations of the federal Clean Water Act of 1977 (33 U.S.C. § 1251 et seq.) and the California Water Code. It ultimately issued

2

the abatement order (Order number R2-2016-0038) on August 12, 2016, as well as administrative civil liability order No. R2-2016-0008 (the liability order) assessing $2.8 million in penalties. (*Sweeney I*, *supra*, 61 Cal.App.5th at pp. 1106–1110.)

The abatement order directed appellants, pursuant to Water Code sections 13267 and 13304, to submit technical reports and clean up the site.[1] Specifically, as relevant to our discussion appellants were required (1) to submit an interim corrective action plan by November 10, 2016 designed to prepare the site for tidal restoration, and begin restoration within 60 days of the Board's acceptance of the plan; (2) to submit by February 10, 2017 a plan to restore the water quality functions of the tidal marsh at the site that existed before the unauthorized activities, and begin implementation within 60 days of approval; and (3) also by February 10, 2017, to submit a mitigation and monitoring plan to compensate for any effects on wetlands and other waters of California caused by unauthorized activities at the site, and begin implementation with 60 days of approval.

Appellants brought writ proceedings challenging the abatement and liability orders, and they initially prevailed in the trial court. But on February 18, 2021, in *Sweeney I*, this division reversed both judgments and directed the trial court to deny the petitions for writ of mandate and requests to set aside the abatement and liability orders. (*Sweeney I*, *supra*, 61 Cal.App.5th at pp. 1107, 1151.)

In July 2021, after the matter was remanded, the Board moved for an injunction requiring compliance with the abatement order. Opposing the motion, appellants argued they did not have the financial resources to comply with the requested injunction. They estimated the total cost of compliance

---

[1] All undesignated statutory references are to the Water Code.

3

would be between three and five million dollars, an amount they said they could not pay. And, they contended, the proposed injunction was not narrowly drawn and did not give them reasonable notice of what conduct was prohibited or required. Sweeney submitted a supporting declaration averring he had no job or income, nor any prospects for a job or income; that the administrative actions had prevented him from operating his business; that he had had to sell his investment property and his home; that he had debts of $1.8 million, owed principally to his lawyers and experts; that the Club had only about $1,000 in the bank; that its assets consisted of Point Buckler Island and various objects on the island; and that no one would invest in the island because of the liability associated with the remediation and mitigation orders. He included no documentation to support his statements.

The trial court filed the order granting the injunction on September 3, 2021, ordering that appellants "shall immediately comply with Order R2-2016-0038."[2] This timely appeal ensued.

## II. Facts Pertinent to Disentitlement

In an effort to enforce the liability and abatement orders, the Board sought discovery to verify Sweeney and the Club's claims of inability to pay and to assist in enforcement. It propounded interrogatories, and it informed Sweeney repeatedly that his responses were incomplete and must be supplemented. Sweeney declined to do so, telling the Board that it already had all the information it needed, so discovery would be pointless and duplicative, and that he was concerned that documents he provided might be used against him in an ongoing federal action.

---

[2] On the same date, the trial court entered judgment against appellants, jointly and severally, and in favor of the Board in the amount of $2,828,000 based on the liability order.

4

*Repeated Defiance of Orders to Appear*

The trial court ordered Sweeney to appear for a debtor examination on April 28, 2022, and the Board issued a subpoena duces tecum seeking production of documents regarding Sweeney's financial condition, including his assets, income, interests in real property, and business interests. Sweeney did not appear, and the court issued an order to show cause why sanctions should not be imposed, and continued the order for examination to May 18, 2022.

Sweeney again failed to appear for the examination, and on May 20, 2022 the trial court granted the Board's motions to compel discovery responses and ordered monetary sanctions be paid to the Board. The court also ordered Sweeney to appear on May 25, 2022 to show cause why the court should not issue further sanctions.

The matter was continued to June 9, 2022 and, when Sweeney again failed to appear, the court issued a bench warrant for his arrest, as well as further orders imposing sanctions and requiring him to appear on July 7 to show cause why he should not be held in contempt and why the court should not issue further sanctions. It appears Sweeney once again failed to appear on July 7.

Sweeney appeared in person on August 24, 2022 and submitted to the debtor examination. During this examination, he acknowledged frankly that he had refused to appear for an earlier examination for reasons of his own, to wit, that he wished to avoid disclosing the name of a business partner who held a 10 percent interest in the Club.

The trial court held Sweeney in contempt for his failure to comply with orders granting the Board's motions to compel production of documents and responses to interrogatories, for his repeated failure to comply with orders for

5

debtor examination and subpoenas, for his failure to comply with the injunction requiring compliance with the abatement order, and for his failure to pay sanctions.[3]

It appears Sweeney was again ordered to appear on October 19, 2022; when he failed to appear a warrant for his arrest was issued. A further arrest warrant was issued on February 24, 2023.

On March 22, 2023, the trial court again held Sweeney in contempt for repeated failure to appear for debtor examinations and to produce documents. On the same date, it issued an arrest warrant for Sweeney, who had again failed to appear for a debtor examination as ordered. It also granted the Board's motion to compel further discovery responses and imposed evidentiary and issue sanctions for failing to comply with prior court orders, including deeming the corporate veil of the Club pierced. As it did so, it explained that "the threat of incarceration in County Jail has been the only means of inducing Sweeney to even partially comply with this Court's orders."

Sweeney appeared at a hearing on May 16, 2023. The court indicated Sweeney was in ongoing contempt for his failure to comply with discovery orders and ordered him to appear for an examination on July 6. On May 26

---

[3] Sweeney filed a petition for writ of habeas corpus, certiorari, or prohibition in this court challenging the contempt order. (*Sweeney v. Superior Court* (Jan. 20, 2023, A166041).) We denied the petition on January 20, 2023. We grant the Board's June 21, 2023 request for judicial notice of the denial, as well as of filings in a bankruptcy action filed by the Club. On March 30, 2023, Sweeney also filed a request for judicial notice. We grant the request as to exhibits 1 and 2, a proposed restoration plan appellants filed in an action in the Eastern District of California and Sweeney's writ petition in case No. 166041 in this court. Sweeney additionally asks us to take judicial notice of facts stated in footnotes 1 and 2 of his opening brief. We deny this request as unnecessary to our decision.

and June 5, the Board wrote to Sweeney and his wife detailing records it claimed he had still not produced.

Before the scheduled July 6, 2023 hearing, Sweeney unsuccessfully sought to disqualify the trial judge. Sweeney filed a petition in this court for a writ of mandamus, which we denied on August 3, 2023.[4]

*Sweeney's Assets and Expenditures*

Sweeney's statements in a declaration and in testimony indicate that he sold real property and deposited $2,600,000 into his bank account in 2017, and he used the money almost immediately to pay bills (including payments to lawyers and consultants) and to buy a house. The house was sold in 2021, and $1,100,000 was deposited into Sweeney's bank account. Those proceeds were spent on paying credit card balances, property taxes, and household expenses, and on acquiring a new property. Sweeney transferred $800,000 to his wife after the sale of the house and the money was used for the costs for a new house, including construction.

In January 2021, after selling the house, Sweeney invested about $350,000 in cryptocurrency, an investment that led to a loss of $275,000 when the cryptocurrency market collapsed. He used the money that was left to pay bills.

*Disposal of Documents*

Sweeney said that he threw away 60 boxes of records "relating to the issues in this case" in January 2021, when he moved from his house to an RV, because he "was pretty fed up with all this stuff" and "didn't care anymore." He estimated it would cost up to $10,000 to obtain his records from the banks.

---

[4] We take judicial notice of the pleadings and exhibits filed in *Sweeney v. Superior Court* (Aug. 3, 2023, A168355).

*Assignment Order, Expenditures, and Sale of Boat*

While these events were proceeding, the Board sought, and in September 2022 obtained, an order assigning some of the earnings and assets of the Club, Sweeney, and Sweeney's wife to the Board, including 80 percent of the proceeds of the sale of any vehicle (including boats) owned by Sweeney or the Club, and restraining them from "encumbering, assigning, disposing [of], or spending non-exempt" assets.[5]

The Club filed for bankruptcy in the Eastern District of California on March 10, 2023. (*In re Point Buckler Club*, *LLC* (Bankr. E.D.Cal, No. 23-bk-20755).) Filings in that action show the Club paid its counsel $17,762 in March 2023, $9,500 of which was paid by Sweeney as "a gift to [the Club]," for which he did not expect to be repaid. They also show that the Club sold a boat to Sweeney's father-in-law for $10,000 in 2023. Sweeney testified at a creditor examination that he sold the boat and kept the proceeds because in his view it was not specifically listed in the turnover and assignment order, notwithstanding that order's express assignment of proceeds from the sale of boats.

*Notices of Compliance and Submission of Plans*

On May 15, 2023, Sweeney submitted a notice of compliance with court orders, averring he had provided all documents the Board had requested. He had previously submitted notices of compliance on November 8, 2022 and February 6, 2023.

---

[5] The assignment order is the subject of another appeal we decide today, *Sweeney v. Regional Water Quality Control Board* (Aug. 30, 2023, A166629) (nonpub. opn.), and the order is described in more detail in our opinion in that case. We take judicial notice of the record in case No. A166629.

8

It appears that in May 2023, Appellants submitted a "Revised Restoration Plan for Point Buckler Island," dated November 9, 2020 and a May 2023 updated plan prepared by an expert as part of an ongoing federal action.

## DISCUSSION

### I. Disentitlement Doctrine

We first consider a threshold issue. The Board asks us to apply the "disentitlement doctrine" to dismiss this appeal, based on Sweeney's longstanding defiance of court orders.

Under this doctrine, an appellate court has inherent authority to dismiss an appeal by a party who refuses to obey a trial court order. (*Stoltenberg v. Ampton Investments, Inc.* (2013) 215 Cal.App.4th 1225, 1229 (*Stoltenberg*).) This is a discretionary tool, which allows an appeal to be dismissed if justified by the balance of equities. (*Gwartz v. Weilert* (2014) 231 Cal.App.4th 750, 757 (*Gwartz*).) "The rationale underlying the doctrine is that a party to an action cannot seek the aid and assistance of an appellate court while standing in an attitude of contempt to the legal orders and processes of the courts of this state. [Citation.] No formal judgment of contempt is required under the doctrine of disentitlement. [Citation.] An appellate court may dismiss an appeal where the appellant has willfully disobeyed the lower court's orders or engaged in obstructive tactics." (*Id.* at pp. 757–758, fn. omitted.)

*In re Marriage of Hofer* (2012) 208 Cal.App.4th 454 is instructive. The husband in that marital dissolution action had substantial income and assets from businesses owned by his family. His wife sought discovery regarding his financial condition, but he did not comply, despite three discovery orders and sanctions. (*Id.* at pp. 456–457.) The trial court ordered the husband to pay

9

$200,000 for the wife's attorney fees, and he appealed on the ground the trial court failed to take into account his ability to pay. (*Id*. at pp. 457–458; Fam. Code, § 2030.) The appellate court dismissed the appeal, explaining, "Where a party unlawfully withholds evidence of his income and assets, he will not be heard to complain that an order is not based on the evidence he refuses to disclose." (*Hofer*, at pp. 458–459, 461.)

Multiple cases have also applied the disentitlement doctrine when a judgment debtor has frustrated or obstructed efforts to enforce a judgment. The appellants in *Gwartz*, for instance, judgment debtors, violated orders enjoining them from transferring any of their assets, thus frustrating the plaintiffs' efforts to enforce the judgment. (*Gwartz*, *supra*, 231 Cal.App.4th at pp. 752, 758–761.) Similarly, the appellants in *Stoltenberg* frustrated the enforcement of a judgment by failing to comply with a subpoena for financial information, even after issuance of a contempt order. (*Stoltenberg*, *supra*, 215 Cal.App.4th at pp. 1227, 1232–1234.) And *Stone v. Bach* (1978) 80 Cal.App.3d 442, 443–444, 448, dismissed an appeal after the appellant was twice found in contempt, once for repeated failure to comply with an order to deposit certain funds into a bank account, and once for refusing to be sworn for examination as a judgment debtor.

Other cases have reached similar conclusions. (*Blumberg v. Minthorne* (2015) 233 Cal.App.4th 1384, 1386, 1390–1392 [appeal dismissed where appellant defied court orders to file an accounting and quitclaim property, missed court dates, and lacked candor in communications with court]; *TMS, Inc. v. Aihara* (1999) 71 Cal.App.4th 377 [appeal dismissed for judgment debtors' willful disobedience of court order to answer postjudgment interrogatories]; *Alioto Fish Co. v. Alioto* (1994) 27 Cal.App.4th 1669, 1682–

10

1683, 1691 [appeal stayed where appellants persisted in willful defiance of trial court orders].)

The Board argues that Sweeney's repeated defiance of court orders meets these standards, and it asks us to apply the disentitlement doctrine to dismiss this appeal. We agree that the record shows a dismaying pattern of disobedience of court orders, particularly of orders to appear. But Sweeney has at least recently complied with orders to appear, and the record provided to us does not show clearly what, if any, discovery obligations Sweeney is currently avoiding. In the circumstances, we exercise our discretion to decline to apply the drastic remedy of dismissal at the present juncture. Instead, we will consider appellants' contentions on the merits.

## II. The Merits—Legal Standards

The Porter-Cologne Water Quality Control Act (§ 13000 et seq.; the Porter-Cologne Act) authorizes the Board to issue a cleanup and abatement order to a person who has, inter alia, created a condition of pollution or nuisance by discharging waste into state waters. (§ 13304, subd. (a).) One aggrieved by such an order may challenge it—as appellants unsuccessfully did—by petition for writ of mandate. (§ 13330.) If a person subject to a cleanup and abatement order fails to comply, at the Board's request the Attorney General "shall petition the superior court . . . for the issuance of an injunction requiring the person to comply with the order. In the suit, the court shall have jurisdiction to grant a prohibitory or mandatory injunction, either preliminary or permanent, as the facts may warrant." (§ 13304, subd. (a).) In that action, there is no need to allege or prove that irreparable damage would occur in the absence of the injunction or that the remedy at law is inadequate, and the injunction "shall issue without those allegations and proof." (§ 13361, subd. (c).)

11

The decision whether to issue a permanent injunction rests in the trial court's sound discretion, and we do not reverse without a showing of clear abuse of that discretion. (*Thompson v. 10,000 RV Sales, Inc.* (2005) 130 Cal.App.4th 950, 964 (*Thompson*).) Abuse of discretion is found if the court exceeded the bounds of reason and there has been a miscarriage of justice. (*Antelope Valley Groundwater Cases* (2021) 63 Cal.App.5th 17, 43.) A trial court also abuses its discretion if it acts with a mistaken view of the scope of its discretion. (*Platypus Wear, Inc. v. Goldberg* (2008) 166 Cal.App.4th 772, 782.)

## III. Equitable Factors

Sweeney's first contention is that the trial court erred in failing to consider his claim of inability to pay when deciding whether to issue the injunction.

When it issued the injunction, the trial court explained that "[i]n light of the denial of the petition for writ of mandate upholding the validity of the cleanup and abatement order," the Board was entitled to the injunction. There was "no legitimate dispute" that Sweeney had not complied with the order, as he admitted when he took the position he was unable to do so. And, the court noted, "equity 'is not above the law and cannot controvert the law' and should not 'intrude[] in matters that are plain and fully covered by positive statute.' (*Robin v. Crowell* (2020) 55 Cal.App.5th 727, 753.)"

Appellants contend the trial court erred in failing to consider equitable factors before issuing the injunction. Specifically, they argue, the trial court should have weighed their present and future ability to pay for the cleanup, a matter they argue implicates their due process rights. (See *United States v. Rylander* (1983) 460 U.S. 752, 757 [party could defend against contempt charge on ground he was unable to comply]; see also *White v. Davis* (1975) 13

12

Cal.3d 757, 773, fn. 8 [right to injunction must be determined as of date of decision by appellate court].)

Appellants rely primarily on two cases they contend establish that if a statute does not mandate an injunction, traditional equitable principles should be considered in deciding whether one should issue. In *Laurel Heights Improvement Assn. v. Regents of University of California* (1988) 47 Cal.3d 376 (*Laurel Heights*), our high court ruled an environmental impact report (EIR) for a facility at the University of California, San Francisco (UCSF) was inadequate based on deficiencies in its discussions of future uses of the facility and alternatives; the court upheld, however, the finding that the environmental effects identified in the present EIR would be mitigated. (*Id.* at pp. 387–388.) After reaching this result, the high court considered whether UCSF should be allowed to continue its current activities at the site pending certification of a proper EIR. (*Id.* at p. 422.) It noted that the California Environmental Quality Act (Pub. Res. Code, § 21000 et seq.; CEQA) required a court, upon finding a CEQA violation, to enter an order with one or more specified provisions, one of which was a mandate ordering all activity suspended. (*Laurel Heights*, at pp. 422–423, citing Pub. Res. Code, § 21168.9, subd. (a).) The high court continued, "Because CEQA does not require us to enjoin the present activity, we rely on traditional equitable principles in deciding whether injunctive relief is appropriate." (*Laurel Heights*, at p. 423.) Noting that the primary purpose of CEQA is to protect the environment, and in light of the substantial evidence that the environmental effects of the present activities would be mitigated, the high court declined to enjoin all activities at the site. (*Laurel Heights*, at p. 424.)

The court in *Laurel Heights* relied (as do appellants) on a decision of the United States Supreme Court, *Weinberger v. Romero-Barcelo* (1982) 456

13

U.S. 305 (*Romero-Barcelo*), which declined to require an injunction after the United States Navy was found in violation of the Federal Water Pollution Control Act's mandate that it obtain a permit for weapons training during which naval ordinance fell into the sea. (*Romero-Barcelo*, at pp. 306–308; see *Laurel Heights*, *supra*, 47 Cal.3d at p. 423.) The Supreme Court rejected the argument that failure to issue an injunction would undermine the integrity of the permit process by allowing the statutory violation to continue, reasoning that "[t]he integrity of the Nation's waters . . . not the permit process, is the purpose of the" statute in question, and lack of an injunction would not undercut that purpose because the Navy had been ordered to obtain a permit and the activity had not polluted the water. (*Romero-Barcelo*, at pp. 314–315.)

Appellants contend these cases require a consideration of equitable factors here as well. They argue that, like the CEQA provision at issue in *Laurel Heights*, section 13304 does not *require* the trial court to issue an injunction, and accordingly the trial court should have weighed equitable factors, including their financial constraints.

On its face, the language of section 13304 is ambiguous. In the absence of other indicia of legislative intent we would hesitate to read statutory language that gives the trial court "jurisdiction to grant a prohibitory or mandatory injunction, either preliminary or permanent, as the facts may warrant" as *requiring* the trial court to grant an injunction simply upon the Board's request. (§ 13304, subd. (a).) But that does not persuade us that the trial court was required to weigh appellants' claimed financial inability to comply with the abatement order. Equity is normally invoked when there is no adequate remedy at law. (*ZF Micro Solutions, Inc. v. TAT Capital Partners, Ltd.* (2022) 82 Cal.App.5th 992, 1000; *Collins v. eMachines, Inc.*

14

(2011) 202 Cal.App.4th 249, 260; *Palo Alto-Menlo Park Yellow Cab Co. v. Santa Clara County Transit Dist.* (1976) 65 Cal.App.3d 121, 131.)  The usual equitable grounds for an injunction are irreparable injury and lack of an adequate remedy at law.  (*In re Marriage of Van Hook* (1983) 147 Cal.App.3d 970, 984; *Romero-Barcelo, supra*, 456 U.S. at pp. 311–312.)  But the statutory scheme before us provides that the Board need not allege or prove either that irreparable damage would result or that the remedy at law is inadequate; it directs that the injunction "*shall issue* without those allegations and proof." (§ 13361, subd. (c), italics added.)  Weighing equitable factors in the ordinary manner in determining whether to issue an injunction to comply with a valid cleanup and abatement order would be inconsistent with this unambiguous legislative command.

Furthermore, there are important distinctions between this case and those on which appellants rely, distinctions that go to the heart of their reasoning.  Unlike the language at issue in *Laurel Heights*, section 13304 does not give the trial court discretion to grant any relief other than "an injunction requiring the person to comply with the order" upon a showing of lack of compliance with a cleanup and abatement order.  (§ 13304, subd. (a).) And unlike the injunctions at issue in *Laurel Heights* and *Romero-Barcelo*, the injunction here directly implicates the statutory purpose of ensuring the cleanup of pollution and waste.  (§ 13304, subd. (a); *United Artists Theatre Circuit, Inc. v. California Regional Water Quality Control Bd.* (2019) 42 Cal.App.5th 851, 866–867 [Porter-Cologne act should be construed liberally to promote its goal of providing for conservation of natural resources].)  We are thus not persuaded *Laurel Heights* and *Romero-Barcelo* undercut the trial court's order.

This case has another key difference from those on which appellants rely. Appellants had the opportunity to raise any appropriate objections to the abatement order when the Board issued it. (See § 13330, subd. (d) [regional board's order not subject to review if not timely challenged by writ of mandate].) They similarly could have raised any objections when they challenged the administrative orders in the proceedings culminating in *Sweeney I*.[6] In that appeal, this division upheld the validity of the abatement order, and that decision is final and binding. (*Sweeney I, supra*, 61 Cal.App.5th at p. 1151; *People v. Barragan* (2004) 32 Cal.4th 236, 246 (*Barragan*) [law of the case]; *Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455.)

Appellants now try for a second bite at the apple, seeking to persuade us that because of their current financial situation they should not be required to comply with an order we have already found valid. We reject this effort. In essence, appellants' position is that even if the abatement order was *originally* enforceable in court, it is now a dead letter—and the trial court should have allowed them to violate it with impunity—because in the intervening years Sweeney spent large sums on other things and appellants can no longer afford to comply. Appellants point to nothing in law or equity that supports this result.

Appellants suggest issuance of the injunction was an idle act because they cannot afford to comply. (See Civ. Code, § 3532.) But even if they currently lack the resources to fulfill all their obligations under the order,

---

[6] Notably, appellants *did* argue that the liability order was improper because they could not afford the $2.8 million penalty, and in *Sweeney I* this court concluded there was substantial evidence to support the Board's finding that appellants could pay it. (*Sweeney I, supra*, 61 Cal.App.5th at pp. 1139-1140.)

there is no basis to presume they cannot fulfill some of the obligations now and may not be able to fulfill all of them in the future.

On the facts of this case, we are not called upon to decide finally whether equitable factors can ever be considered in determining whether to grant an injunction under section 13304. Nor do we hold that a regional board has an absolute right to an injunction any time a party has not complied with an order. We hold only that appellants have not established that the trial court was required to take their current financial constraints into account when it issued this injunction.

## IV.    Overbreadth

Appellants next contend the injunction is unenforceable because it is not narrowly drawn to give reasonable notice of what is prohibited. (*Thompson, supra,* 130 Cal.App.4th at p. 979, citing *Schmidt v. Lessard* (1974) 414 U.S. 473, 476 ["Since an injunctive order prohibits conduct under threat of judicial punishment, basic fairness requires that those enjoined receive explicit notice of precisely what conduct is outlawed"].)

The injunction requires appellants to "immediately comply with Order R2-2016-0038," and it recites that a copy of the order is attached as Exhibit 1 and incorporated into the injunction. Appellants suggest the order was not in fact attached, but they make no claim they were unaware of its contents.

With somewhat more conviction, appellants argue that among the abatement order's provisions, they must submit three plans that are "acceptable to the Water Board Executive Officer," an interim corrective action plan, a restoration plan, and a mitigation and monitoring plan, the components of which are set forth in the abatement order. But, they argue, they *had* submitted such plans: in its cross-complaint for injunctive relief, the Board alleged that appellants had submitted inadequate plans, set forth

17

a nonexhaustive list of omissions in those plans, and alleged that, as a result of those omissions, appellants had not complied with the abatement order. Appellants argue that because the list of omissions was not exhaustive, and because the abatement order required them to obtain the subjective approval of the Board's executive officer, the injunction violates the requirement that they be given reasonable notice of what conduct is required.

We reject this argument. At their heart, appellants' challenges are to the provisions of the abatement order itself. The injunction did no more than require appellants to comply with the abatement order, an order that was already once challenged by writ of mandate and found valid in *Sweeney I*. That ruling is law of the case and may not now be challenged. (*Barragan*, *supra*, 32 Cal.4th at p. 246; see also § 13330, subd. (d).)

## V. Right to Hearing on Compliance

Appellants' final contention is that the trial court erred in failing to hold a hearing on whether they had complied with the abatement order. They point out that the Board's own cross-complaint for injunctive relief establishes that they submitted plans for interim corrective action, restoration, and mitigation and monitoring, albeit not to the Board's satisfaction. As a result, they seem to argue without citing legal authority, they were entitled to a trial on whether this constituted partial compliance.

We are unpersuaded. The abatement order required appellants not only to prepare but also to implement adequate plans. In opposition to the request for an injunction, appellants claimed neither that they had complied with this requirement nor even that they would promptly implement their own plans if the Board approved them; rather they argued they simply could not comply. Sweeney also informed the Board he would not comply, as reflected in an email attached to his opposition brief. There is no serious

18

argument that appellants did not "fail[] . . . to comply with the cleanup or abatement order" (§ 13304, subd. (a)) in a manner that authorizes issuance of an injunction.

## DISPOSITION

The September 3, 2021 order granting the injunction is affirmed. Costs on appeal are awarded to respondent.

TUCHER, P.J.

WE CONCUR:

FUJISAKI, J.
RODRÍGUEZ, J.

19

RODRÍGUEZ, J., Concurring.

I agree with and join in the majority's disposition and analysis of the merits. I write separately because I would have applied the doctrine of appellate disentitlement and dismissed the appeal due to repeated and ongoing violations of court orders. (*Stoltenberg v. Ampton Investments, Inc.* (2013) 215 Cal.App.4th 1225, 1230 ["an appellate court 'may dismiss an appeal where there has been *willful disobedience or obstructive tactics*' "].) "A party to an action cannot, with right or reason, ask the aid and assistance of a court in hearing his demands while he stands in an attitude of contempt to legal orders and processes of the courts of this state." (*MacPherson v. MacPherson* (1939) 13 Cal.2d 271, 277.)

I won't spill a lot of ink laying out the extent of the " 'wilful disobedience or obstructive tactics' " at issue here (*Alioto Fish Co. v. Alioto* (1994) 27 Cal.App.4th 1669, 1683); the majority ably does so. (Maj. opn. *ante*, at pp. 4–6.) Suffice it to say John D. Sweeney repeatedly obstructed respondent's discovery efforts and violated numerous court orders to appear at debtor examinations and hearings. (*Id.* at pp. 5–6.) The trial court imposed monetary sanctions, found him in contempt on more than one occasion, and issued several bench warrants for his arrest. (*Ibid.*) Nevertheless — seemingly unbowed and undeterred — Sweeney's refusal to comply with court orders apparently continues. Moreover, even if he could demonstrate some compliance, I would apply the doctrine and dismiss. I do not believe "seeing the light" at the eleventh hour or halting and occasional compliance at a time of a party's choosing precludes appellate disentitlement.

I acknowledge the "right to an appeal must not be lightly forfeited, and where a doubt exists as to a litigant's conduct being contumacious or wilful, an appellate court will tolerate temporarily the acts which were disruptive of

1

the judicial process." (*Tobin v. Casaus* (1954) 128 Cal.App.2d 588, 592.)  But this is the hopefully rare case where a party's persistent and willful disobedience and obstructive conduct warrants appellate disentitlement.

_____
Rodríguez, J.

*Sweeney et al. v. Regional Water Quality Control Board, San Francisco Bay Region* (A163683)